UNITED STATES of America,

v.

Bartholomew EGAN, Richard Hart, Angel Daniel Pacheco, and Jose Pedro Vasquez–Castro, Defendants.

No. 80 Cr. 207 (RWS).

United States District Court,
S. D. New York.

June 25, 1980.

On Motion to Suppress July 8, 1980.

· John S. Martin, Jr., U. S. Atty., S.D.N.Y., by David W. Denton, Asst. U. S. Atty., New York City, for the United States.

Gerald Lefcourt, New York City, for Egan.

Homans, Hamilton, Dahmen & Marshall, Boston, Mass., for Hart by William P. Homans, Jr., Boston, Mass.

Lavin & Batchelder, New York City, for Vasquez–Castro by Harry C. Batchelder, Jr., New York City.

Louis R. Aidala, New York City, for Pacheco.

SWEET, District Judge.

On March 23, 1980, officers from the Coast Guard cutters CAPE STRAIT and VIGOROUS boarded the vessel JOSE GREGORIO in rough seas approximately forty miles south of Montauk, Long Island. The crew members included defendants Bartholomew Egan and Richard Hart, who are United States citizens, and Angel Daniel Pacheco and Jose Pedro Vasquez–Castro, citizens of Colombia. The crew members denied knowledge of registry of the ship, though the flags of five countries—Venezuela, Colombia, Panama, Ecuador and the Netherlands—were found in the pilot house. The Coast Guard seized approximately thirty tons of marijuana from the hold of the JOSE GREGORIO.

The Government has filed a three count indictment against the four defendants. Count One charges the four defendants with a conspiracy to import and to possess with intent to distribute thirty tons of marijuana in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), 846, 952, 960(b)(2), and 963. Count Two charges that the defendants possessed with intent to distribute this marijuana in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2. Count Three charges an unlawful attempt to import this marijuana, in contravention of 21 U.S.C. §§ 812, 952, 960(b)(2) and 963 and 18 U.S.C. § 2. The

defendants have made numerous motions with respect to the indictment.

### A. *Subject Matter Jurisdiction*

The defendants contend that the drug laws under which they are charged do not apply to their activities. It is undisputed that the seizure of the JOSE GREGORIO took place on the high seas[1] and that the ship is a stateless vessel.[2] The indictment contains no allegation that any overt act occurred within the territorial limits of the United States. Nonetheless, I conclude that the statutes under which the defendants are charged have extraterritorial effect and therefore that this court has jurisdiction, recognizing that this specific issue has not previously been ruled upon by our Circuit.

The United States has the authority to punish the crimes alleged under two established principles of international law, the objective territorial principle and the protective principle.

Under the objective territorial principle,

[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect...

*Strassheim v. Milton Daily*, 221 U.S. 280, 282, 31 S.Ct. 558, 559, 55 L.Ed. 735 (1911).

The courts in this country have long relied on the objective territorial principle as a basis for assertion of extraterritorial jurisdiction. *See Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927); *United States v. Cadena*, 585 F.2d 1252, 1257 (5th Cir. 1978); *United States v. King*, 552 F.2d 833, 851–52 (9th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977); *Rivard v. United States*, 375 F.2d 882, 887 (5th Cir.), *cert. denied sub nom. Groleau v. United States*, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967). A conspiracy on the high seas to commit drug offenses which are intended to have an impact on the United States falls within the objective territorial principle despite the absence of an overt act within the United States. *United States v. Mann*, 615 F.2d 668 (5th Cir. 1980).[3]

The protective principle permits a sovereign state

to prosecute those who commit acts outside of its territory which have a potentially adverse effect on its security or governmental functions, even though no criminal effect actually occurs within the state.

Note, "Drug Smuggling and the Protective Principle," 39 La.L.Rev. 1189, 1190 (1979). This principle has also been utilized as a basis for jurisdiction by the United States

---

1. The territorial waters of the United States extend three nautical miles from the coastline. 43 U.S.C. § 1301(a)(2); *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122–23, 43 S.Ct. 504, 506–07, 67 L.Ed. 894 (1923). The United States also exercises authority for certain purposes over the "customs waters," whose limits are twelve nautical miles from the coast, 19 U.S.C. § 1401(j). Under the Fishery Conservation and Management Act of 1976, the United States established a Fishery Conservation Zone, which extends 200 nautical miles from the coast, 16 U.S.C. § 1811, but does not assert territorial sovereignty over these waters. The high seas lie seaward of the territorial waters. *United States v. Louisiana*, 394 U.S. 11, 22, 89 S.Ct. 773, 780, 22 L.Ed.2d 292 (1969); *United States v. Warren*, 578 F.2d 1058, 1064 n. 4 (5th Cir. 1978) (en banc); *United States v. Hilton*, 619 F.2d 127, at 131 n. 1 (1st Cir. 1980).

2. A "stateless" vessel is one which claims the protection of no sovereign. *United States v.*

*Cortes*, 588 F.2d 106 (5th Cir. 1979). While the statelessness of the JOSE GREGORIO does not affect the subject matter jurisdiction of this court, it obviates the need to assess the effect of any international treaty upon the seizure in question. *See United States v. Postal*, 589 F.2d 862, 868 n. 8 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979).

3. *See United States v. Perez–Herrera*, 610 F.2d 289 (5th Cir. 1980) (vessel seized 70 miles from United States coastline); *United States v. Hilton*, 619 F.2d 127 (1st Cir. 1980) (vessel seized 20 miles from coastline); *United States v. Baker*, 609 F.2d 134 (5th Cir. 1980) (vessel seized 9 miles from coastline); *United States v. Cortes*, 588 F.2d 106 (5th Cir. 1979) (vessel seized 26 miles from coastline); *United States v. Cadena*, 585 F.2d 1252 (5th Cir. 1978) (vessel seized 200 miles from coastline); *United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (vessel seized 700 miles from coastline) (en banc).

courts. *See United States v. Pizzarusso,* 388 F.2d 8, 10 (2d Cir.), *cert. denied,* 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968); *United States v. Keller,* 451 F.Supp. 631 (D.P.R.1978). The unlawful importation of drugs bypasses the federal customs laws, and thus directly challenges a governmental function. *Id.* at 635. *See also United States v. Perez–Herrera,* 610 F.2d 289, 292 (5th Cir. 1980). In addition, it has been suggested that, in view of the size of the drug problem in the United States and the dimension of the unlawful importation of controlled substances, such unlawful importation represents a threat to the security of the United States. Note, "Drug Smuggling and the Protective Principle," *supra,* 39 La. L.Rev. at 1200. Accordingly, the protective principle supports assertion of jurisdiction in this case.

█ In addition, as to defendants Hart and Egan, who are United States citizens, the nationality principle, which permits a state to prosecute offenses committed by its nationals abroad, also provides a basis for jurisdiction. *See Blackmer v. United States,* 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932); Clark, "Criminal Jurisdiction over Merchant Vessels Engaged in International Trade," 11 J.Mar.L. & Comm. 219, 220–21 (1980).

Not only does international law erect no barriers against prosecution of the offenses charged in this case, but the Constitution confers upon Congress the power

> to define and punish piracies and felonies committed on the high seas, and offenses against the law of nations . . .

Art. I, Cl. 8. The defendants do not dispute that Congress has authority to proscribe drug offenses on the high seas which are intended to have an impact on the United States. *United States v. Flores,* 289 U.S. 137, 149–50, 53 S.Ct. 580, 582, 77 L.Ed. 1086 (1933); *Blackmer v. United States, supra,* at 436–38, 52 S.Ct. 252, 254–55, 76 L.Ed.2d 375; *Ford v. United States, supra.*

The defendants contend, however, that in enacting the Comprehensive Drug Abuse Prevention and Control Act of 1970, Congress did not intend to exercise its authority to extend the scope of the drug laws beyond the territorial limits of the United States, except where expressly provided. They rely upon the rule of construction that federal laws are presumptively territorial in scope and, unless a contrary intent is expressed by Congress, should not be construed to apply extraterritorially. *See Foley Brothers, Inc. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575–77, 93 L.Ed. 680 (1949); *Stowe v. Devoy,* 588 F.2d 336, 341 (2d Cir. 1978), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2862, 61 L.Ed.2d 299 (1979); *United States v. Cotroni,* 527 F.2d 708, 711 (2d Cir. 1975), *cert. denied,* 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976).

None of the statutes under which the defendants are being prosecuted is expressly made applicable to conduct occurring outside the United States. Moreover, section 959 of Title 21, which is not involved in this case and proscribes the manufacture or distribution of controlled substances with intent that such substance be unlawfully imported into the United States, specifically provides: "This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States." The defendants contend that the statutes in this case, which, along with section 959, were enacted as part of the Comprehensive Drug Abuse and Prevention Act of 1970, cannot be applied to extraterritorial activities without a specific Congressional direction.

In *United States v. Bowman,* 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922), the Supreme Court discussed the scope of the presumption of territoriality. That case involved a prosecution for conspiracy to defraud a corporation owned by the United States. The four defendants had formed the conspiracy while on a ship on the high seas; the overt acts had occurred outside the territorial limits of the United States. The federal statute under which they were prosecuted contained "no reference to the high seas as a part of the *locus* of the offenses defined by it. . . ." *Id.* at 97, 43 S.Ct. at 40 (emphasis in original). Despite the absence of an express provision, the

Court held that the statute did apply on the high seas. The Court distinguished between two types of offenses:

> Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement and frauds of all kinds, which affect the peace and good order of the community, must of course be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard
> . . . .
> But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents. Some such offenses can only be committed within the territorial jurisdiction of the Government because of the local acts required to constitute them. Others are such that to limit their *locus* to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the *locus* shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

*Id.* at 98, 43 S.Ct. at 41. Where the "natural inference from the character of the offense is that the sea would be a probable place for its commission," *id.* at 99, 43 S.Ct. at 41, it would be unreasonable and would defeat congressional intent to construe the statute otherwise. *See also United States v. Flores, supra* (jurisdiction asserted over murder committed on board United States vessel in territorial waters of Belgian Congo).

By its nature, the crime of conspiracy to import or to possess with intent to distribute would be expected to occur frequently outside the territorial limits of the United States. Moreover, insofar as the effect on this country is concerned, it is immaterial whether the conspiracy arises within this country or elsewhere. As in *Bowman, supra* 260 U.S. at 99, 43 S.Ct. at 41, the "natural inference from the character of the offense is that the sea would be a probable place for its commission."

The restriction of the geographic scope of the drug laws would impair their effectiveness. The purpose of the drug laws is to thwart the illegal importation and distribution of narcotics. As Congress stated in the statute itself,

> (2) The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.

> . . . . .

> (7) The United States is a party to the Single Convention on Narcotic Drugs, 1961, and other international conventions designed to establish effective control over international and domestic traffic in controlled substances.

21 U.S.C. § 801(2) and (7). The legislative history of the Act specifies that Congress viewed drug trafficking as an international problem of "epidemic proportions," and concluded that,

> [t]he illegal traffic in drugs should be attacked with the full power of the Federal Government. The price for participation in this traffic should be prohibitive. It should be made too dangerous to be attractive.

H. R. Rep. No. 1444, 91st Cong. 2d Sess., *reprinted in* [1970] U.S. Code Cong. & Ad. News, pp. 4566, 4575 (quoting report of President's Advisory Commission on Narcotic and Drug Abuse). As the Court of Appeals for the Fifth Circuit has stated,

"The power to control efforts to introduce illicit drugs into the United States from the high seas and foreign nations is a necessary incident to Congress' efforts to eradicate all illegal drug trafficking." *United States . v. Baker,* 609 F.2d 134, 137 (5th Cir. 1980). *See also United States v. Mann, supra* at 671.

The court rejects defendants' claim that Congress did not intend the conspiracy statutes, 21 U.S.C. §§ 846 and 963, to apply outside the territorial United States in the absence of an overt act within this country. *See Ford v. United States, supra* 273 U.S. at 624, 47 S.Ct. at 5411. The Court of Appeals has held that proof of an overt act is not required under the drug conspiracy statutes. *See United States v. Knuckles,* 581 F.2d 305, 311 (2d Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *United States v. Bermudez,* 526 F.2d 89 (2d Cir. 1975), *cert. denied,* 424 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). Therefore, Congress could not have intended that jurisdiction to prosecute a drug conspiracy formed outside the United States would depend upon proof of an overt act within this country.

This conclusion that the drug laws apply extraterritorially applies not only to Counts One and Three, the charges of conspiracy and attempt to import, but also to Count Two, which charges the substantive crime of possession with intent to distribute, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(B). Count Two does not charge merely possession of illegal substances, a crime which would be presumed to be strictly local in scope, *United States v. Bowman, supra* 260 U.S. at 98, 43 S.Ct. at 41, but rather possession with intent to distribute. This crime, like conspiracy and attempt to import, is one which could be anticipated to occur often on the high seas. Because of the size of the shipment seized and the location of the JOSE GREGORIO, an intent to distribute marijuana can be inferred. To restrict the ambit of sections 812 and 841 to the territorial United States would emasculate Congress' effort to curb illegal drug distribution within the country. *See United States v. Baker, supra,* 609 F.2d at 137.

To interpret the drug laws alleged to have been violated in this case in the narrow manner urged by the defendants would conflict with the nature of the offenses proscribed by those statutes and would defeat the goal of Congress to utilize its full authority to combat the illegal narcotics invasion. Where the effect of limiting the compass of a penal statute to acts entirely within the United States "would be greatly to curtail the scope and usefulness of the statute," the extraterritorial effect of the legislation will be inferred. *United States v. Bowman, supra* 260 U.S at 98, 43 S.Ct. at 41. *See also United States v. Perez–Herrera, supra* at 290.

The inclusion in 21 U.S.C. § 959 of specific language giving that section extraterritorial application does not alter this conclusion. Section 959 proscribes the manufacture or distribution of a controlled substance in a foreign country so long as the defendant intends or knows that the substances will be imported into the United States. *See United States v. King, supra; United States v. Daniszewski,* 380 F.Supp. 113 (E.D.N.Y.1974). Thus, unlike the statutes at issue in this case, section 959 is specifically aimed at activities which take place and are completed within foreign countries even if the defendant himself plays no part in importing the drugs into the United States or conspiring to do so. Because of the broad reach of section 959, extending well beyond the high seas into foreign territory, it was necessary for Congress to define its scope, given the customary view of territoriality, a view which does not necessarily apply to the high seas, as set forth above.

Defendants' reliance on *Cunard S.S. Co. v. Mellon,* 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894 (1923), is misplaced. In that case, the activity sought to be forbidden was the antique "practice of carrying intoxicating liquors for beverage purposes as part of a ship's sea stores," *id.* at 129, 43 S.Ct. at 509. There was no claim that carriage of beverages would have any direct or indirect impact on the United States. The Court also noted that,

By the laws of all the foreign ports at which the ships touch [carriage of intoxicating liquors] is permitted and by the laws of some it is required.

*Id.* at 119, 43 S.Ct. at 505. By contrast, marijuana and other drugs outlawed by the Comprehensive Drug Prevention and Control Act of 1970 are not universally accepted, but are outlawed by both bilateral and multilateral treaties, and are in effect a form of international contraband. *See United States v. Perez–Herrera, supra* at 292.

Accordingly, I hold that the drug laws charged in the indictment do apply to the defendants' activities in this case, even though such activities took place solely on the high seas.

B. *Multiplicity of Counts One and Three*

Defendants Hart and Egan claim that Count One, which charges a conspiracy to import and to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 846 and 963, and Count Three, charging an attempt to import marijuana in violation of 21 U.S.C. § 963, are multiplicious.

Count One charges a conspiracy to violate two substantive statutes, 21 U.S.C. § 841(a)(1), which prohibits possession with intent to distribute a controlled substance, and 21 U.S.C. § 960(b)(2), which proscribes importation of a controlled substance. The defendants do not argue that Count One is duplicitous, an argument foreclosed by *United States v. Murray,* 618 F.2d 892, at 894, 898–99 (2d Cir. 1980). Rather they claim that since Count One charges in part a *conspiracy* to import a controlled substance in violation of 21 U.S.C. § 963, the charge in Count 3 of *attempt* to import a controlled substance, also in violation of 21 U.S.C. § 963, is multiplicious.

Section 963 provides,

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine . . .

21 U.S.C. § 963. By including conspiracy and attempt in the same section, the defendants urge, Congress manifested its in-

tent that the defendants should not be convicted of both crimes arising out of the same transaction.

The crimes of conspiracy and attempt meet the test set forth in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), which requires that each separate crime include an element which the other does not. *See Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 1437, 63 L.Ed.2d 715 (1980). A conspiracy requires proof of a plan among conspirators, which is not an element of an attempt. An attempt, by contrast, requires proof of a substantial step toward completion of an offense, *United States v. Stallworth,* 543 F.2d 1038 (2d Cir. 1976), which is not an element of a conspiracy charge. *See United States v. Jackson,* 435 F.Supp. 434 (S.D. N.Y.1976), *aff'd,* 560 F.2d 112 (2d Cir.), *cert. denied,* 434 U.S. 941, 98 S.Ct. 434, 54 L.Ed.2d 301 (1977).

Notwithstanding this difference in proof, defendants contend that Congress did not intend to create two separate crimes in section 963 which are punishable separately. I disagree.

Section 963, like its counterpart, section 846, "penalizes attempts as well as conspiracies." *Bifulco v. United States,* 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980). "Congress dealt with both these forms of inchoate crime in a single provision . . ." *id.* at 399, 100 S.Ct. at 2258. Under the test set forth in *United States v. Murray, supra,* both these crimes could not be charged in a single count, since such a charge of conspiracy or attempt would be duplicitous.

Neither the statutory language nor the legislative history of section 963 indicates that Congress intended to require the Government to elect between prosecution for conspiracy and for attempt. The fact that both crimes are defined in a single section does not mandate that result, *see United States v. Sarno,* 456 F.2d 875, 879 (1st Cir. 1972) (separate conviction for drug conspiracy and substantive crime proscribed in same section), nor does the fact that both crimes arise out of the same transaction and rest on the same proof. *See United*

*States v. Lord,* 565 F.2d 831, 841 (2d Cir. 1977) (concurrent sentences for conspiring to rob a bank and aiding and abetting robbery). Congress has evinced an intent to punish drug offenses heavily. *See United States v. Marotta,* 518 F.2d 681, 685 (9th Cir. 1975). Accordingly, the separate charges of conspiracy and attempt to import controlled substances are not multiplicious.

C. *Admissibility of Prior Act Evidence and Motions for Severance*

Defendants Pacheco and Vasquez–Castro seek to preclude the Government from introducing evidence of their prior crimes. Vasquez–Castro was previously arrested off the coast of Florida on May 5, 1978 on board a vessel containing 50,000 pounds of marijuana, and was subsequently deported. On December 8, 1977, Pacheco was arrested on board a ship containing eleven tons of marijuana off the coast of North Carolina. He pled guilty to importation of marijuana and remains on probation from that offense.

■ The admissibility of prior crimes evidence against Pacheco and Vasquez–Castro will depend on whether the prior crimes are relevant to some issue at trial, Fed.R.Evid. 404(b), and whether the probative value of such evidence outweighs its prejudicial value. Fed.R.Evid. 403. *United States v. Mohel,* 604 F.2d 748, 751 (2d Cir. 1979); *United States v. Lyles,* 593 F.2d 182, 193 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). Although these prior crimes would appear to be admissible to prove knowledge and intent of Vasquez–Castro and Pacheco, an assessment of the relevance and probative and prejudicial value of this evidence must await completion of the defendants' presentation. *United States v. Figueroa,* 618 F.2d 934, at 938 (2d Cir. 1980); *United States v. Danzey,* 594 F.2d 905, 912 (2d Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979).

The more difficult issue is whether the likelihood that such evidence might be held admissible against Vasquez–Castro and Pacheco to show knowledge or intent warrants

severance of Hart and Egan at this time in order to prevent any potential prejudicial spillover. The Court of Appeals has specified,

> The extent of prejudice to a co–defendant from evidence of one defendant's prior acts depends on an assessment of how that evidence might affect the jury's consideration of a co–defendant's guilt, despite limiting instructions.

*United States v. Figueroa, supra,* at 946.

In *United States v. Rosenwasser,* 550 F.2d 806 (2d Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83 (1977), the admission of prior crimes evidence against a co–defendant was held not to prejudice unduly the trial of the defendant. The court stated,

> Generally, when similar act evidence is admitted in a multiple defendant trial, it is clear that the co–defendant claiming prejudice could not have been involved in the similar offense. In those circumstances, there is little doubt that a cautionary instruction is sufficient to preserve the co–defendant's right to a fair trial.

*Id.* at 808 (citations omitted). The court noted that because of the circumstances of the prior offense by the co–defendant, the jury could have inferred that the defendant himself was involved. However, the trial court's limiting instructions were held sufficient to prevent any unfairness to the defendant.

In *United States v. Figueroa, supra* the Court of Appeals reversed the convictions of two defendants due to admission of prior crimes evidence against their co–defendant under the unusual circumstances presented there. The prior crimes had been improperly admitted against the co–defendant. The trial had taken only two days, so that judicial economy had not weighed strongly in favor of joint trials. Because the evidence against the defendants was thin, admission of evidence of the prior crime of the co–defendant had severely prejudiced them. The trial court had also made certain comments which undermined the defendants' attack on the credibility of the key Government

witness. Finally, a retrial of the co–defendant had already been ordered which required presentation of "the identical evidence" used against the defendants.

■ At this time, admission of prior crimes evidence against Pacheco and Vasquez–Castro does not require a severance of Hart and Egan. The previous arrests of Pacheco and Vasquez–Castro occurred over two years ago and thus, unlike *Rosenwasser*, there is no intimation that Hart and Egan were involved in those arrests. The evidence will not be admitted unless, at the time admission is sought, the probative value of such evidence as to Pacheco and Vasquez–Castro outweighs its prejudicial impact upon all the defendants. Due to the apparent strength of the Government's case, the danger of prejudicial spillover is minimal. The trial of this case will require at least one week. Therefore, the interests of judicial economy weigh in favor of a joint trial. *See United States v. Werner*, 620 F.2d 922, at 928 (2d Cir., 1980). The motion for a severance is denied.

### D. *Delay in Appearance before Magistrate*

Pacheco and Vasquez–Castro contend that due to unnecessary delay in appearance before a Federal Magistrate, the indictment against them should be dismissed and statements taken during the period of delay should be suppressed.

The JOSE GREGORIO was seized on the high seas on March 23, 1980 with the four defendants and five other Colombian crew members aboard. Although Hart and Egan appeared before a Federal Magistrate on March 24, 1980, the seven Colombian crew members were turned over to the Immigration and Naturalization Service ("INS") and were held for approximately four days. On March 27, 1980, a complaint was filed against all seven Colombian crew members and arrest warrants were issued. The defendants were arraigned at 11:15 a. m. on March 28, 1980.

While not conceding a violation of Fed.R. Cr.P. 5, the Government represents that it will not seek to introduce any statements made by Pacheco and Vasquez–Castro subsequent to their transfer to INS custody. Statements taken after that time are ordered suppressed.

■ The time required for seizure of JOSE GREGORIO, and during the transportation of Pacheco and Vasquez–Castro to New York City did not constitute unnecessary delay. Statements taken during that period will not be suppressed. *United States v. Warme*, 572 F.2d 57, 61 n.3 (2d Cir.), *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 393 (1978); *United States v. Davis*, 532 F.2d 22, 25 (7th Cir. 1976); *United States v. Marrero*, 450 F.2d 373 (2d Cir. 1971), *cert. denied*, 405 U.S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808 (1972).

■ Pacheco and Vasquez–Castro also appear to argue that evidence obtained by the Government from other sources during their detention by the INS should be suppressed. *United States v. Klapholz*, 17 F.R.D. 18, 23 (S.D.N.Y.1955), *aff'd*, 230 F.2d 494 (2d Cir.), *cert. denied*, 351 U.S. 924, 76 S.Ct. 781, 100 L.Ed. 1454 (1956). Even assuming the pre–arraignment delay to have been in violation of *McNabb–Mallory* requirements, there is no basis for suppressing evidence from other sources which is not alleged to have been discovered due to any violation of the defendants' rights.

■ Defendants also contend that the delay in this case was so egregious that the indictment should be dismissed. *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973). Although the delay in this case may have been longer than necessary, it certainly does not rise to the level of outrageous conduct which shocks the conscience. No dismissal of the indictment is warranted.

### E. *Suppression of Evidence*

The defendants contend that a suppression hearing is required to determine whether the maneuvers of the Coast Guard cutters VIGOROUS and CAPE STRAIT resulted in a seizure of the JOSE GREGORIO

prior to the time probable cause was established. The Government contends that no hearing is required as to these issues, since the defendants do not have standing to contest seizure of the marijuana. *See Rakas v. Illinois*, 439 U.S. 128, 135 n.4, 99 S.Ct. 421, 426 n.4, 58 L.Ed.2d 387 (1978).

In cases subsequent to *Rakas*, the Court of Appeals has reaffirmed the viability of the doctrine of automatic standing, which permits a defendant charged with a possessory offense to challenge seizure of evidence without asserting a possessory interest in the evidence. *See United States v. Agapito*, 620 F.2d 324, at 334 (2d Cir. 1980); *United States v. Penco*, 612 F.2d 19, 22–23 (2d Cir. 1979).

 Since defendants have standing under the automatic standing rule, it is appropriate to hold a suppression hearing with respect to the events leading to the seizure of the marijuana, and whether the defendants had a legitimate expectation of privacy in the hold of the ship. *See Rakas, supra* at 143–44 n.12, 99 S.Ct. at 430 n.12; *United States v. Arboleda*, 633 F.2d 985, at 991–992 (2d Cir. 1980).

## F. *Discovery Motions*

Vasquez–Castro and Pacheco have made a series of requests for exculpatory material. Because of the breadth of these requests, no specific rulings are possible. The Government is required, of course, to fulfill its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and the Jencks Act, 18 U.S.C. § 3500.

 Request 1, for statements made by Vasquez–Castro and Pacheco, including copies of any rough notes made by a Government agent concerning such statements, is granted under Fed.R.Cr.P. 16(a)(1)(A). Requests 6 and 7 are also granted. Fed.R. Cr.P. 16(c) and (d). All other requests are denied.

 Pacheco and Vasquez–Castro have also moved for inspection of grand jury minutes pursuant to Fed.R.Cr.P. 6(e), based on the alleged possibility of prosecutorial misconduct before the grand jury. The Advisory Committee notes to Rule 6(e) state:

> Nor are the changes intended to permit the defendant to challenge the conduct of the attorney for the government before the grand jury absent a preliminary factual showing of serious misconduct.

Where, as here, no particularized showing of need or misconduct has been made, the courts have consistently denied such requests for inspection of grand jury transcripts. *See Dennis v. United States*, 384 U.S. 855, 870, 86 S.Ct. 1840, 1849, 16 L.Ed.2d 973 (1966); *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978). The motion is denied.

With respect to the discovery requests of Hart and Egan, request H is granted to the extent items were seized from Hart and Egan; request L is granted insofar as such logs relate to the tracking and boarding of the JOSE GREGORIO. The Government has represented that no services of the armed forces were utilized in the apprehension of the JOSE GREGORIO. All other requests are denied.

The suppression hearing will be held on June 26, 1980, and trial will commence on June 30.

## ON MOTION TO SUPPRESS

The defendants have moved to suppress thirty tons of marijuana seized from the JOSE GREGORIO, evidence concerning "baggies" of marijuana viewed aboard the JOSE GREGORIO, statements made by defendants Egan and Hart following their arrest on board the JOSE GREGORIO and the VIGOROUS, and statements made by defendants Pacheco and Vasquez–Castro following their arrest. Pacheco and Vasquez–Castro have also moved to exclude similar act evidence and witness depositions of material witnesses. Pacheco, Hart and Egan have renewed their motions for a severance.

These motions present the difficulties of enforcement of the laws of the United States by the United States Coast Guard

("Coast Guard") on the high seas, while seeking to observe the punctilio of constitutional guarantees whose contours have proved elusive to this and other courts. Observance of the somewhat intricate doctrines of the Fourth Amendment can be complicated by sixty–five mile per hour gusts and twelve foot swells one hundred fifty miles into the Atlantic Ocean. Nevertheless, if the arm of the Government can reach out over the Atlantic to seize the JOSE GREGORIO, a stateless vessel manned by seven Colombian crew members and two United States citizens, as this court has recently held, so also do the rights assured by the Constitution extend to possible law enforcement abuses on the high seas.

In addition to the testimony adduced during a four day suppression hearing, copies of the logs of the Coast Guard cutters VIGOROUS and CAPE STRAIT and copies of communications by Coast Guard officials were submitted as evidence. This opinion constitutes findings of fact and conclusions of law as required by Fed.R.Cr.P. 12(e).

According to its radio traffic initiated on March 21, 1980, the Coast Guard received on March 20, 1980 uncorroborated information that on March 19, a ship was offering vessels $10,000 to transport marijuana to the Massachusetts coast and that on March 20, three vessels were offered from $1,000 to $20,000 to transport a man ashore from a Venezuelan vessel named JOSE GREGORIO, described as a 75 to 80 foot yacht/steel–hulled freighter, at a location 48 miles off Shinnecock Inlet on Long Island. The Coast Guard checked the name of the vessel with the El Paso Intelligence Center ("EPIC"), a central computer maintained by the Drug Enforcement Administration containing a correlation of information concerning drug enforcement activities. The response from EPIC was that in July, 1978, a Venezuelan vessel named JOSE GREGORIO, a 75 foot freighter with white hull and blue superstructure, had been seized in conjunction with drug smuggling.

The Coast Guard cutter VIGOROUS, 210 feet in length, of 1,000 displacement, was notified of this information.

The Coast Guard patrol boat CAPE STRAIT, 95 feet in length, was on routine patrol off Sandy Hook on March 20, 1980. In accordance with instructions from the Coast Guard's Group Rockaway Station to be on the alert for a vessel, the JOSE GREGORIO, suspected of smuggling. CAPE STRAIT began a "high suspect effectiveness period." On the morning of March 21, the CAPE STRAIT sighted a vessel named the JOSE GREGORIO, home port Los Piedras, Venezuela. The CAPE STRAIT commenced surveillance, having sought unsuccessfully to communicate with the JOSE GREGORIO by loud hailer, radio and flaghoist. The JOSE GREGORIO, after taking various courses and speeds, settled on a course of 130 ° at 4 to 5 knots, followed at a distance of 500 to 700 yards by the CAPE STRAIT. The VIGOROUS was notified of the sighting and proceeded to the scene at 14 knots.

By early afternoon the visibility had dropped to 500 yards, and at 19:00,[1] the commanding officer of the CAPE STRAIT observed bales of marijuana in the water alongside his vessel. Because of the sea conditions and the visibility, it was not possible to recover the bales of marijuana, recognized by the commanding officer to be such as a result of prior experience loading and unloading bales similar in appearance in the course of duty.

Communication was established between the VIGOROUS and the CAPE STRAIT, and searchlight sightings were exchanged at a distance of eight miles, at which time the CAPE STRAIT was on the starboard beam of the VIGOROUS, which was proceeding on a course of 200 °. CAPE STRAIT and JOSE GREGORIO were on a course of 130 ° and proceeding at less than half the speed of VIGOROUS, which was closing rapidly. As the courses converged, VIGOROUS altered course to the left, and at the time of sighting was on a course

1. Time will be set forth as local time recorded by the participants on a 24 hour basis in ac- cordance with naval custom. Thus, 7:00 P.M. becomes 19:00.

within 30 ° of parallel course. All observers of the scene who testified as to the relative positions, Coast Guard officers Kerski, Powers and McCann, stated that the VIGOROUS approached the CAPE STRAIT from the latter's port quarter and that the CAPE STRAIT was astern of and off the starboard quarter of the JOSE GREGORIO. The VIGOROUS proceeded to close on the JOSE GREGORIO until she was between 200 and 500 yards off the port beam of the JOSE GREGORIO, her bridge even with the stern of the JOSE GREGORIO and on a parallel course at approximately the same speed.

The VIGOROUS swept the JOSE GREGORIO with her 24 inch searchlight, addressed the JOSE GREGORIO by loud hailer, identifying herself as a Coast Guard vessel, and requested the JOSE GREGORIO to communicate by radio. Commander Powers, Captain of the VIGOROUS, saw faces at the portholes of the JOSE GREGORIO as she rolled in the sea. No commands or requests were given to stop, or to alter course. The JOSE GREGORIO stopped, maintaining only enough speed to retain steerage way, and failed to make any response or acknowledgment of the request to communicate.

After a short interval the JOSE GREGORIO resumed its southeasterly course, the VIGOROUS dropped back on the port quarter of the JOSE GREGORIO, and the CAPE STRAIT maintained its position on the starboard quarter, all proceeding on a course and at a speed selected by the JOSE GREGORIO. On occasion the VIGOROUS illuminated the JOSE GREGORIO with its searchlight and sought to make radio contact.

At 23:06 a radio communication was received on board the VIGOROUS, and the sender requested medical assistance.[2] When the Coast Guard inquired if the sender was the vessel being escorted, the sender responded affirmatively. Commander Pow-

ers, the commanding officer of the VIGOROUS, stated that the boarding would take place the following morning and sought to obtain the identification of the ship and its home port, which information was not forthcoming.

During the early morning of March 22, the CAPE STRAIT was detached and departed the scene.

After dawn, at 06:50, the JOSE GREGORIO inquired if the Coast Guard was going to come aboard with a corpsman and was told that the boarding would depend on the weather. During this period the wind was about 35 miles per hour, gusting to 65 miles per hour, and the waves and swells were up to 12 feet or more. The JOSE GREGORIO gave no information about its identity.

At 10:45 the VIGOROUS notified the JOSE GREGORIO that if it desired to have a small boat sent over, it should alter its course 180 °. The JOSE GREGORIO altered course and headed in a northwesterly direction toward Long Island. She radioed that another crew member was urinating blood and needed medical attention. Shortly after noon the JOSE GREGORIO stated that its crew consisted of seven Colombians and two Americans, who were doing the navigating. Both Americans were sick. The JOSE GREGORIO was running out of food and water. The Colombians were scared and did not know their destinations.

At 13:00 and thereafter, the JOSE GREGORIO transmitted a description of the sick crew member's symptoms as heart pains and then at 13:26 posed three questions: "Are we free to go where we want?," "Can we go to Bermuda?," "Are we in international waters?." Commander Powers testified that he answered each question affirmatively and added that the VIGOROUS would follow. The radio log indicates a response by VIGOROUS at 13:36 to the effect that Bermuda was 700 miles away and it was the understanding on VIGOROUS that the JOSE GREGORIO had no

2. The radio logs maintained by the VIGOROUS and CAPE STRAIT were received in evidence. Except where indicated by quotation marks the messages set forth are not verbatim. Conse-

quently these findings set forth simply the sense of the messages transmitted as understood by the officer responsible for making the entry.

food and water and had an injured or sick man aboard. The JOSE GREGORIO responded with a statement that an instruction had been given to ask the questions.

At 15:12, the VIGOROUS observed bundles going over the side of the JOSE GREGORIO, some of which were recovered, tested and found to contain marijuana.

At 18:58, the JOSE GREGORIO again requested to know when medical help would be sent and was told that the weather would determine the time of boarding. A similar exchange occurred on the morning of March 23 with the vessels in a similar position. At noon, the VIGOROUS announced its intention to board. At 15:04 the JOSE GREGORIO again inquired as to the boarding and was told that it would occur in about an hour. At 17:04 the JOSE GREGORIO was requested to have all personnel on deck other than its helmsman, and the boarding was commenced. It was during these radio communications that Commander Powell noted that the speaker on the JOSE GREGORIO had a distinctive New England accent.

Ensign McCann was in command of the boarding party of seven, two of whom carried shotguns, the remainder armed with .45 caliber pistols. As soon as the boarding party came on board, Ensign McCann smelled the odor of marijuana. The Colombians were placed in handcuffs and were given *Miranda* warnings. Ensign McCann questioned Hart and Egan as to the registry, destination and cargo of the JOSE GREGORIO and received no information in response. Egan stated, "Go take a look," and gestured toward a hatch apparently leading to the engine room. In response to McCann's question, one or both indicated that the cargo was in that direction. Each refused to accompany McCann. Egan stated, "It's pot, man."

McCann left the Americans in the company of other members of the boarding party and proceeded alone down to the engine room in an effort to locate the main beam

number.[3] The effort was unsuccessful, but he observed the contents of the forward hold through a hatch which was jammed partly open. The cargo was recognized by McCann to consist of bales of marijuana, later determined to weigh approximately thirty tons.

Ensign McCann returned to the pilot house and was told by one or both of the Americans in response to his question that the afterhold of the JOSE GREGORIO contained the same cargo. As he came from the engine room Ensign McCann testified that he saw marijuana sprinkled on the deck. Ensign McCann placed Hart and Egan under arrest, stated that he was seizing the ship and advised them that they were suspected of conspiracy to smuggle marijuana into the United States, that they had a right to remain silent, the right to an attorney when they reached port and that they did not have to answer any questions or volunteer anything. Hart stated something to the effect: "Don't do the crime if you can't do the time," a remark which was omitted from Ensign McCann's initial report.

Later, Ensign McCann observed two plastic bags containing marijuana, one in the cupboard in the galley, the other in the pilot house. He neither seized nor tested the contents of the bags.

Hart, Egan and the rest of the crew were taken to the VIGOROUS, received food and showers. All except Hart remained handcuffed in the mess hall. Hart was in leg irons attached to a stanchion since he wished to lie down. Both Hart and Egan were given an advice of rights form which both signed and on which Egan indicated a request for an attorney.

Chief Warrant Officer Ripley was in charge of the prisoners. He was not instructed to interrogate the prisoners, nor did he put any questions to them concerning the JOSE GREGORIO or the matters for which they had been arrested.

---

**3.** The main beam number is a permanent registration number affixed to the keel of every vessel as an aid to identification and registry.

On a metal ship such as the JOSE GREGORIO the main beam number is welded into the ship.

In the course of the evening, Ripley and Egan had an exchange in the course of "idle conversation" during which Egan stated that he had been restoring a house and working in a trucking business, and that he lived in Massachusetts. He said that his parents would be ashamed of him.

Under similar circumstances during the same period, Hart conversed with Ripley. Hart was reading a Bible. Ripley remarked that anyone reading the Bible can't be all bad. Hart stated that reading the Bible had prevented him from jumping over the side, that he felt that sick. They established that Ripley knew Hart's father and that Hart had sailed out of Woods Hole. Ripley commented in sarcasm that his father would be proud of him. Hart responded by repeating the comment made to Ensign McCann: "Well, if you are going to do the crime, you got to be willing to do the time."

■ The preliminary issue is whether the defendants have standing to assert a violation of Fourth Amendment rights with regard to the seizure of marijuana from the hold of the JOSE GREGORIO. The defendants do have standing to raise any Fourth Amendment violation which may have occurred due to their arrests and the search of their persons. However, in this case, the discovery of marijuana did not result from the arrest of the defendants. At the point the arrests occurred on the afternoon of March 23, 1980, the Coast Guard was already aware of the presence of marijuana on board the JOSE GREGORIO. Bales of marijuana had been thrown overboard on March 22, and the crew of the VIGOROUS had recovered and tested two of the bales. Furthermore, Ensign McCann testified that as soon as he stepped aboard the JOSE GREGORIO he perceived a strong scent of marijuana. As a result, even assuming that the arrests and searches of the defendants were illegal, the discovery of the marijuana was not the fruit of any such illegality, but resulted from prior circumstances. *See Rawlings v. Kentucky*, —— U.S. ——, ——————, 100 S.Ct. 2556, 2562–64, 65 L.Ed.2d 633 (1980);

*Dunaway v. New York*, 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979).

■ The defendants argue that JOSE GREGORIO was seized on the afternoon of March 21, 1980, upon the arrival of the VIGOROUS and that the seizure resulted in an arrest of their persons. I disagree. Even assuming that a seizure of the JOSE GREGORIO occurred on March 21, that seizure did not constitute an arrest of the defendants. The Coast Guard officers did not restrain them physically, curtail their liberty aboard the JOSE GREGORIO, or conduct a search of their persons. No arrest of the defendants occurred on March 21.

The Supreme Court has repeatedly emphasized that "a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights." *United States v. Payner*, —— U.S. ——, ——, 100 S.Ct. 2439, 2442, 65 L.Ed.2d 468 (1980). *See Rakas v. Illinois*, 439 U.S. 128, 133–140, 99 S.Ct. 421, 425–429, 58 L.Ed.2d 387 (1978). The Court in *United States v. Payner, supra* 100 S.Ct. at 2442, stated that

the defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party.

■ In *United States v. Salvucci*, —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), the Supreme Court abandoned the rule of automatic standing, which permitted a defendant charged with a possessory offense to challenge the legality of a search without claiming possession of evidence illegally seized. In order to determine whether a defendant has standing, a court must assess

not merely whether the defendant had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched.

*Id.* at 2553. In *Salvucci*, the Court held that a defendant did not have standing to challenge the legality of the seizure of stolen property from his mother's apartment.

In *Rawlings v. Kentucky, supra,* —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the police seized illegal drugs belonging to the defendant from a woman's handbag. Nevertheless the Court held that the defendant's own Fourth Amendment rights had not been violated since he had no legitimate expectation of privacy in the purse.

■ The defendants do not satisfy either branch of the *Rakas* test for assertion of a Fourth Amendment right. First, they have claimed no property interest in the seized marijuana and thus cannot claim to be aggrieved by its seizure. *United States v. Salvucci, supra.*

Second, the defendants have not demonstrated a reasonable expectation of privacy in the hold of the JOSE GREGORIO. The factors relevant to determination of a legitimate expectation of privacy include the right to exclude others from the place searched, the manner in which a person has used the location and the extent to which the person has taken precautions to assure the privacy of the place. *See Rawlings v. Kentucky, supra* 100 S.Ct. at 2562, *id.* at 2566 (Blackmun, J., concurring); *Rakas v. Illinois, supra,* 439 U.S. at 143–44 n.12, 99 S.Ct. at 430 n.12; *id.* at 152–53, 99 S.Ct. at 435–436 (Powell, J., concurring); *United States v. Arboleda,* 633 F.2d 985, at 991 (2d Cir. 1980).

■ A vessel, like an automobile, carries with it a lesser expectation of privacy than a home or office. *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974); *Chambers v. Maroney,* 399 U.S. 42, 49, 90 S.Ct. 1975, 1980, 26 L.Ed.2d 49 (1970); *United States v. Hilton,* 619 F.2d 127 (1st Cir. 1980); *United States v. Miller,* 589 F.2d 1117, 1125 (1st Cir. 1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *United States v. Ingham,* 502 F.2d 1287 (5th Cir. 1974), *cert. denied,* 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975). As the Supreme Court stated in *Carroll v. United States,* 267 U.S. 132, 153–54, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925):

> [T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the Government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

■ A fishing–type vessel such as the JOSE GREGORIO within the 200 mile Fishery Conservation Zone is subject to administrative Coast Guard searches to determine whether the vessel is properly registered. Such a search could include an examination of the main beam number in the vessel's hold. *See United States v. Hilton, supra,* slip op. at 133. Moreover, like all ships in international waters, the JOSE GREGORIO would have been subject to a customs search upon entering the territorial waters of the United States, or of any other nation to which it may have repaired.

The JOSE GREGORIO was not a pleasure vessel, but rather a commercial ship. The hold of the vessel is not a place in which personal effects would ordinarily be kept. *Compare Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (personal luggage) *with United States v. Williams,* 617 F.2d 1063, 1084 (5th Cir. 1970) (ship hold) (*en banc*). In any event, though Hart and Egan were apparently in control of the ship, *see United States v. Ochs,* 595 F.2d 1247 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979), there is no evidence that they either owned the boat or held any property interest in the cargo itself.

The defendants also took no precautions to guard the privacy of the forward hold. When the Coast Guard boarded, the hatch from the engine room to the forward hold was jammed ajar. Prior to the boarding, the defendants had jettisoned bales of marijuana into the Atlantic, thereby rendering the contents of the hold apparent.

Considering all the factors set forth in *Rakas* and its progeny, the defendants had no legitimate expectation of privacy in the hold of the JOSE GREGORIO. Accordingly, the search of the hold by the Coast Guard did not infringe any Fourth Amendment rights of the defendants themselves.

The defendants also contend that the *Salvucci* decision in effect abrogates substantive rights previously enjoyed by the defendants, particularly since the Supreme Court has collapsed the issue of standing into the substantive inquiry as to whether a defendant possesses a Fourth Amendment right. *Rakas v. Illinois, supra* 439 U.S. at 143, 99 S.Ct. at 430. They urge that *Salvucci* should not be applied retroactively. I disagree. First, the refusal to recognize automatic standing in this case does not involve a retroactive application of *Salvucci*, since that case was decided prior to the suppression hearing. *Salvucci* did not alter the substantive rights held by the defendants under the Fourth Amendment, but merely changed the showing which they must make in order to establish that their rights have been infringed in cases involving possessory offenses. The defendants had a full opportunity at the suppression hearing to establish that their own Fourth Amendment rights were violated. They failed to do so.

Second, even if this were a case of retroactive application, I would apply *Salvucci* retroactively. The familiar factors used to determine retroactivity of a court decision—the effect of a decision on the truth–seeking function of the trial, the good faith reliance on the prior rule by law enforcement officials and the effect of retroactivity on the administration of justice, *Hankerson v. North Carolina*, 432 U.S. 233, 241–42, 97 S.Ct. 2339, 2344–45, 53 L.Ed.2d 306 (1977); *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)—have limited relevance in assessing the retroactivity of a decision such as *Salvucci* which limits rather than expands the capacity of the defendants to challenge law enforcement conduct. To the extent these factors apply, they support retroactivity. The rule announced in *Salvucci* is designed to enhance the truth–seeking goal of the trial. *See Salvucci, supra,* —— U.S. at —— 100 S.Ct. at 2554. Moreover, defendants have submitted no evidence that they relied on the automatic standing doctrine in transporting marijuana on the high seas. Accordingly, *Salvucci* does apply to this case.

Although the defendants have not shown that seizure of the marijuana from the hold of the JOSE GREGORIO violated their own Fourth Amendment rights, it is appropriate to consider their claims as if they had made a proper showing.

The defendants contend that the JOSE GREGORIO was "seized" for Fourth Amendment purposes when the CAPE STRAIT began its surveillance of the JOSE GREGORIO on the morning of March 21, or if not at that point, then on the evening of March 21, when the VIGOROUS closed on the JOSE GREGORIO, came abeam of it, shone its light on the vessel and attempted to communicate by radio and loud hailer. I disagree.

■ A "seizure" occurs within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion) (footnote omitted); *id.* at —— n.1 100 S.Ct. at 1881 n.1 (Powell, J., concurring); *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

■ The following of the JOSE GREGORIO by the CAPE STRAIT did not constitute a seizure of the vessel. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). The CAPE STRAIT approached no closer than 500 yards from the stern of the JOSE GREGORIO. The fact that the CAPE STRAIT sought to communicate with the JOSE GREGORIO by flag signals, loud hailer and radio also does not constitute a seizure. Such requests for communication are customary at sea and were perfectly

reasonable given the weather conditions, the random course steered by the JOSE GREGORIO, the small size of the vessel and the absence of a flag.

Further, no seizure occurred when the VIGOROUS arrived on the scene and commenced surveillance. The JOSE GREGORIO was not "surrounded" by the Coast Guard. The CAPE STRAIT remained off the starboard quarter of the JOSE GREGORIO while the VIGOROUS maneuvered off the port beam of the vessel. It is true that the VIGOROUS made repeated efforts to communicate with the JOSE GREGORIO, and shone its powerful light on the vessel. However, the VIGOROUS did not cut off the JOSE GREGORIO or impede its progress. It did not order the JOSE GREGORIO to heave to for boarding. It issued no command or direction to the JOSE GREGORIO to stop or to change course. The only direction issued was a request to communicate. The JOSE GREGORIO did not comply with that request.

Although the JOSE GREGORIO slowed briefly to a speed sufficient only to maintain steerage way, that alone does not establish that a seizure occurred. The stopping was not in response to a command by the VIGOROUS. The JOSE GREGORIO halted its progress only momentarily, then proceeded on a southeasterly course of its own choosing. The JOSE GREGORIO refused to communicate with the VIGOROUS. The objective facts do not demonstrate that the JOSE GREGORIO reasonably would have thought that it was not free to depart at that time.

*United States v. Nicholas,* 448 F.2d 622 (8th Cir. 1971), the case principally relied on by the defendants, is distinguishable. There, two police officers approached either side of a parked car. One officer flashed his badge, knocked on the car window and ordered the defendant to roll down the window. This display of authority was held to constitute a seizure.

The show of authority was less significant here than in *Nicholas.* The Coast Guard vessels came no closer than 200 yards to the JOSE GREGORIO. The VIGOROUS did not issue any orders to the JOSE GREGORIO, but merely requested communication as it came alongside the vessel. Unlike the defendant in *Nicholas,* the defendants did not feel compelled to comply with any show of authority on the part of the Coast Guard.

The defendants also cite the Fifth Circuit's statement in *United States v. Williams, supra,* 617 F.2d at 1071 n.1, for the proposition that

> Even the mere stopping of a vessel, without a boarding, is a fourth amendment "seizure" since the governmental action restrains the vessel's freedom to proceed.

As concluded above, however, the Coast Guard vessels did not restrain the JOSE GREGORIO's freedom to proceed. No "stopping" occurred as discussed in *Williams,* and therefore no seizure took place.[4]

Even if it were to be concluded that a seizure occurred contrary to the conclusion just stated, there was no violation of Fourth Amendment rights. At the time of the alleged seizure in the early evening of March 21, the Coast Guard had sufficient evidence to warrant a seizure. The factors constituting probable cause at that time included the EPIC "hit," the unevaluated tip concerning mother ship operations, the hearsay statements of fishing vessels indicating that the JOSE GREGORIO was unwilling to enter a United States port, the size and type of the JOSE GREGORIO, which offered no functional explanation of

---

4. Even assuming that a "stopping" did occur within the meaning of *Williams,* the seizure did not violate the Fourth Amendment under the standard enunciated in *Williams* or the standard for reasonable investigatory stops recognized by this Circuit. An investigatory stop does not violate the Fourth Amendment's proscriptions where the official has observed specific and articulable facts justifying a reasonable suspicion that the individuals are engaged in criminal activity. *See United States v. Forero Rincon,* 626 F.2d 218 at 219 (2d Cir. 1980); *United States v. Buenaventure–Ariza,* 612 F.2d 1338 (2d Cir. 1979); *United States v. Rico,* 594 F.2d 320 (2d Cir. 1979). As described herein, the facts available here gave rise not only to a reasonable suspicion, but to probable cause.

its presence, its location in March, its apparent home port, the absence of a flag, the refusal to communicate and the presence of what appeared to be marijuana floating in its wake. Although the Government concedes that the boat reported by EPIC turned out to be a different JOSE GREGORIO, there has been no showing that this error was the result of gross negligence on the part of the Government. Accordingly, the EPIC "hit" supported the Coast Guard's reasonable belief at the time that the JOSE GREGORIO was involved in illegal drug smuggling activities. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Barnes*, 604 F.2d 121, 152 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 620 (1980).

For these reasons, even assuming that a seizure occurred at 19:00 on March 21, that seizure was justified under either the "reasonable suspicion" standard applicable to an investigative stop, *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio, supra*, or the probable cause standard required for a warrantless seizure under exigent circumstances. *See Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

■ I also conclude that no seizure occurred prior to the boarding on March 23. The evidence concerning the surveillance of the vessel, the communications concerning medical assistance and the courses maintained until the afternoon of March 23 demonstrate voluntary action by the JOSE GREGORIO. No seizure occurred during these maneuvers, but only a legal surveillance.

■ The boarding on March 23 was consensual. In order for a consent to a Fourth Amendment search to be valid, the Government must

demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973). *Accord United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *United States v. Busic*, 592 F.2d 13 (2d Cir. 1978); *United States v. Isom*, 588 F.2d 858, 861 (2d Cir. 1978).

■ The communications between the JOSE GREGORIO to the VIGOROUS on the subject of medical assistance for a crew member and course changes demonstrate consent, including the communications concerning freedom to leave or to travel to Bermuda. The crew members of the JOSE GREGORIO were not in Government custody or under interrogation, which would have been inherently coercive. They faced difficult choices because of the medical problems of Hart and Egan, the lack of food, the weather conditions, and apparent fear of the Colombian crew members. Yet these circumstances were not created by the Coast Guard, but by the defendants themselves.

Considering all the circumstances, I conclude that the defendants made an "essentially free and unconstrained choice" to permit the boarding and that their wills were not overborne, nor their "capacity for self–determination critically impaired." *Schneckloth v. Bustamonte, supra* 412 U.S. at 225, 93 S.Ct. at 2046.

The defendants focus on testimony by Commander Powers that he intended to board the JOSE GREGORIO and would have done so regardless of consent. Yet, Commander Powers' unexpressed intentions are immaterial to the issue of the defendants' consent. *See Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978). Although the VIGOROUS notified the JOSE GREGORIO that it intended to follow, the intention to board was expressed in response to the request of the JOSE GREGORIO.

■ Even without consent, the boarding would not have violated the Fourth Amend-

ment. At the time of boarding, there was probable cause to believe that the crew members of the JOSE GREGORIO were violating United States drug laws for the reasons already enumerated. In addition, since the evening of March 21 the VIGOR-OUS had recovered and tested bales of marijuana observed to be thrown from the JOSE GREGORIO. Captain Powers had heard the accents of Hart and Egan over the radio which he perceived to be New England accents, which tended to confirm the unevaluated mother ship tip. The consent of the Venezuelan government to boarding had been obtained, which tended to validate the EPIC hit. Considered together, these factors strongly indicated that the crew members aboard the JOSE GREGORIO were engaged in smuggling marijuana into the United States.

Due to the existence of probable cause, the Coast Guard had authority to board the JOSE GREGORIO to arrest the defendants even in the absence of consent. *Beck v. Ohio*, 379 U.S. 89, 96–97, 85 S.Ct. 223, 228–29, 13 L.Ed.2d 142 (1964). No warrant was required in order to effect this arrest. *Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975).

Once on board, the Coast Guard would have been entitled to conduct a cursory search for any crew members in order to secure the ship. *See United States v. Agapito*, 620 F.2d 324, at 336 (2d Cir. 1980). However, the testimony demonstrates that this was not done. Rather, Ensign McCann waited for approximately thirty minutes after the boarding before going down to the engine room.

 The defendants argue that a warrant was required in order to search the vessel and that under Fed.R.Cr.P. 41(c)(2), a warrant could have been obtained by radio.

The Government counters that Fed.R.Cr.P. 41(a) only permits the issuance of a warrant by a judicial officer "within the district wherein the property or person sought is located," so that the Coast Guard could not have obtained a warrant for a search on the high seas. However, as noted in a similar context, "Rule 41(a) cannot limit or restrict the dictates of the Constitution to [sic] the United States." *Berlin Democratic Club v. Rumsfeld*, 410 F.Supp. 144, 160 (D.D.C. 1976). In the court's view, a judicial officer has inherent authority to issue a warrant for a search on the high seas.

 The limited warrantless search of the vessel conducted here was valid for two reasons. First, a cursory sweep of the ship was justified by analogy to the "automobile exception" to the warrant requirement. In *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970), the Supreme Court held that the warrantless search of an automobile stopped on the highway was permissible, because

> there was no constitutional difference between the intrusion of seizing and holding the automobile until a warrant could be obtained, on the one hand, and searching the vehicle on the other.

*Arkansas v. Sanders*, 99 S.Ct. 2586, 2594 n.14 (1979). *See also United States v. Ochs, supra* at 1253–54. Like an automobile, a boat is "inherently mobile." The potential for destruction of evidence on the trackless seas is at least as great as that upon the highways. Thus the exception recognized in *Maroney* for the search of a car applies with equal force to a vessel seized at sea. The cursory investigation by Ensign McCann was reasonable and did not contravene the Fourth Amendment.

Second, under 14 U.S.C. § 89(a),[5] McCann was justified in descending into the engine

---

5. Section 89(a) of Title 14 provides

(a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States

room to check for the main beam number. The language of section 89(a) refutes the defendants' position that it is a purely administrative statute and can not be used for criminal investigations.[6] Ensign McCann had authority under that provision to check the main beam number to identify the vessel. The defendants refused to specify the registry or destination of the vessel, which gave rise to a reasonable suspicion that the vessel was stolen. Since grounds existed to place the crew members under arrest, it was apparent that the Coast Guard would be required to bring the JOSE GREGORIO into port and it was appropriate to determine the origin of the boat. While lawfully in the engine room, the bales of marijuana were in plain view through the hatch of the forward hold, See Coolidge v. New Hampshire, 403 U.S. 443, 465–473, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564 (1971); United States v. Ochs, supra at 1257, and thus were subject to seizure without a warrant.

For the foregoing reasons, I hold that the marijuana seized from the JOSE GREGORIO on May 23, 1980 will not be suppressed.

Hart and Egan have moved to suppress certain statements which they made while on board the JOSE GREGORIO and the VIGOROUS. With respect to these motions, I conclude that the arrests of Hart and Egan occurred when the Coast Guard boarded the JOSE GREGORIO even though Ensign McCann did not formally announce that they were under arrest. Both Hart and Egan were placed under guard. They did not receive Miranda warnings at that point, but made several statements to McCann, which must be excluded on the Government's direct case. Miranda v. Arizona, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, because there is no evidence that the statements were involuntary or inherently suspect, these statements can be used to impeach the testimony of Hart and Egan. See Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

Ensign McCann testified that he later gave Miranda warnings to Hart and Egan that did not include a warning that any statement they made could be used against them. See Miranda, supra at 444, 86 S.Ct. at 1612. Therefore, Hart's statement while on board the JOSE GREGORIO, "Don't do the crime if you can't do the time," was taken in violation of his Miranda rights and may not be used on the Government's direct case. It is admissible to impeach Hart's credibility if he testifies.

The statements by Egan to Chief Warrant Officer Ripley on board the VIGOROUS, however, are admissible. Egan's Sixth Amendment rights had not attached at the time of Egan's detention on board the VIGOROUS. See United States v. Mohabir, 624 F.2d 1140, at 1147 (2d Cir. 1980). However, once Egan had requested an attorney, he could not be interrogated until he had consulted an attorney. Miranda v. Arizona, supra at 474, 86 S.Ct. at 1627. The principal issue, therefore, is whether Ripley's conversation with Egan constituted "interrogation."

In Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (U.S. 1980), the Supreme Court held that statements volunteered by a defendant who had requested counsel did not infringe the defendant's Miranda rights since the defendant was not "subjected to either express questioning or its functional equivalent." Id. at

rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

6. Because probable cause existed in this case to justify the boarding, it is unnecessary to determine whether under section 89(a) the Coast Guard is authorized to board a vessel to investigate suspected criminal activity based on a lesser standard than probable cause and, if so, the statute would be constitutional.

446 U.S. at 299, 100 S.Ct. at 1689. The Court stated,

> A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or action, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 301–302, 100 S.Ct. at 1690 (footnotes omitted).

Under the definition set forth in *Innis*, the conversation between Ripley and Egan, which was not designed to elicit an incriminating response, and did not represent a Coast Guard attempt to utilize "subtle compulsion," did not constitute interrogation or its functional equivalent. The admissions by Egan to Ripley accordingly were not received in violation of *Miranda* and will not be suppressed.

The Hart statements while on board the VIGOROUS also were not taken in violation of Hart's *Miranda* rights. Hart, unlike Egan, did not request an attorney. His Sixth Amendment rights had not attached. Under *Miranda*, the police were not prohibited from questioning Hart. In view of the types of questions asked by Ripley, the Ripley conversation might well constitute interrogation. Even if it was interrogation, however, it did not constitute illegal interrogation. Therefore, Hart's statements will not be suppressed.

Vasquez–Castro has moved to suppress the testimony of DEA Agent Lopez. Lopez interviewed Vasquez–Castro and the six other Colombian defendants on board the VIGOROUS on March 24, 1980. On the previous day, Vasquez–Castro had signed a Coast Guard form on which he requested an attorney. The express interrogation of Vasquez–Castro by Lopez violated Vasquez–Castro's *Miranda* rights. Accordingly, Lopez will not be permitted to testify to any statements taken from Vasquez–Castro

on the Government's direct case, though his testimony will be permitted for impeachment purposes.

The defendants have moved to exclude the evidence concerning plastic baggies found in the galley and the head by Ensign McCann. The bags were neither seized nor tested. There is no evidence linking the bags to any of the defendants in particular or to the cargo of the ship. Because of the highly prejudicial nature of the baggies and the lack of probative value of the evidence in showing any illegal activity by the defendants, the evidence will not be admitted.

Vasquez–Castro alleges that the Government violated 18 U.S.C. § 3500, the Jencks Act, by failing to turn over notes made by DEA Agent Garcia prior to the taking of depositions of material witnesses and therefore that the depositions should be suppressed.

The notes of Garcia should have been disclosed prior to the deposition of the material witnesses. However, the effect of a failure to disclose is set forth in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In a case such as this in which the non–disclosure was inadvertent, the defendants must show that the non–disclosure was material to the cross–examination of the material witnesses. However, the notes of Garcia are consistent with the testimony of the material witnesses and thus would not have assisted the defendants in cross–examining those witnesses. The motion to suppress the depositions is denied.

Vasquez–Castro also moves to dismiss the indictment or to exclude the testimony of Agent Lopez due to his destruction of a handwritten draft of a DEA 6 report. *United States v. Paoli*, 603 F.2d 1029 (2d Cir.), *cert. denied*, 444 U.S. 926, 100 S.Ct. 264, 62 L.Ed.2d 182 (1979). In *Paoli*, the court stated that where original notes made by a Government witness in the course of an investigation were destroyed prior to trial, the Government would bear a heavy burden of showing that the destruction did

not prejudice the defendants. *See United States v. Bufalino*, 576 F.2d 446, 449 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978).

 No sanctions are required in this case. The information gained during the Lopez interview does not appear to be central to the Government's case, as was the evidence in *Bufalino* and *Paoli*. Moreover, Lopez's testimony concerning his interview with Vasquez–Castro and Pacheco has already been suppressed on the Government's direct case. The destruction of the rough handwritten notes has not prejudiced the defendants, and no sanctions will be imposed.

Pacheco and Vasquez–Castro seek to exclude evidence of other crimes, as discussed in a prior opinion. The Government represents that Vasquez–Castro was seized on board a vessel named the MEIRY in May 1978 approximately 100 miles east of Miami, Florida. The ship is alleged to have had bales of marijuana all over its deck and in its holds which were plainly visible and perceptible by smell. If established, these facts would support an inference of knowledge and intent of Vasquez–Castro, issues that he has not conceded.

Pacheco pled guilty to illegal importation of marijuana after he was arrested off the coast of North Carolina in December, 1977 on board a vessel carrying eleven tons of marijuana. This conviction also supports an inference of knowledge and intent on the part of Pacheco.

Pacheco and Vasquez–Castro argue that they are entitled to a pre–trial ruling on the issue of admissibility of these prior acts. However, under *United States v. Figueroa*, 618 F.2d 934 at 938 (2d Cir. February 26, 1980), it would be error to make a final ruling until after the defendants have rested. However, under the facts currently before the court, the probative value of these prior acts in demonstrating the knowledge and intent of Pacheco and Vasquez–Castro appears to outweigh their prejudicial value as to all defendants. Accordingly, if at the end of the defendants' case, knowledge and intent remain at issue as to Pacheco and Vasquez–Castro, these prior crimes will be admitted with an appropriate limiting instruction.

I adhere to my prior decision that none of the defendants is entitled to a severance.