413 So.2d 396 (1981)
Russell L. COLLIER
v.
STATE.
1 Div. 189.
Court of Criminal Appeals of Alabama.
June 30, 1981.
Rehearing Denied August 4, 1981.
*397 Thomas M. Haas and James M. Byrd, Mobile, for appellant.
*398 Charles A. Graddick, Atty. Gen., and Mark R. Ulmer, Asst. Atty. Gen., for appellee.
BOWEN, Judge.
The defendant was indicted and convicted for the unlawful possession of marihuana in violation of Alabama Code Section 20-2-70 (1975). Sentence was fifteen years' imprisonment.
Deputy Norman Pierce of the Baldwin County Sheriff's Department, while patrolling County Road 4 which runs parallel to the Intracoastal Canal in Gulf Shores, observed an "18-wheeler truck" turn into the driveway at Moesch's Diesel repair shop. It was approximately 11:30 P.M., Saturday, February 9, 1980.
Sometime later that night Deputy Pierce drove back to Moesch's Diesel. The truck he had seen earlier was gone. Deputy Pierce then drove to the driveway belonging to Childress and Company, just west of Moesch's Diesel, to see if he could see "any activity". He found a chain stretched across the driveway. Deputy Pierce testified that he had been patrolling the area for approximately a year and had never seen a chain blocking the Childress driveway.
Around 3:00 A.M. on February 10, Deputy Pierce drove past the area a third time and observed truck tracks coming out of Childress's driveway. He noticed that the chain was down. The tracks led down the driveway to the Intracoastal Canal where Pierce saw pieces of burlap scattered on the ground.
Deputy Pierce went back to this site at 9:00 A.M. and found the chain back across the driveway. He contacted Chief Deputy Jim Anderson who met him between 11:30 and 12:00 A.M. Together Pierce and Anderson took the chain down, drove in and saw the imprint of a boat edged into the bank of the canal. Anderson also saw a piece of burlap, a plastic surgeon's glove and one or two cotton work gloves. Looking east toward Moesch's Diesel, Pierce and Anderson saw a shrimp boat, The Ricky G. This boat had mud on its bow "that would have matched the imprint in the bank on the canal." The Ricky G was tied to the slip at Moesch's Diesel yard. Deputy Pierce testified that he "knew the boat hadn't been there" the previous night "when I was down there." The yard foreman at Moesch's Diesel did not know anything about the boat.
Chief Deputy Anderson, Deputy Pierce and the yard foreman boarded the boat and upon lifting the hatch cover discovered numerous bales of marihuana covered in burlap. Anderson and Pierce left the boat and set up surveillance. Deputies Bobby Stewart and Roland Howell were later called to take over surveillance.
Around 8:00 P.M. on February 10, The Ricky G backed out of the slip at Moesch's Diesel into the canal and traveled approximately two hundred yards west to Childress's Landing where a ten-wheeler refrigerator truck had backed to the edge of the canal from Childress's driveway. Chief Deputy Anderson and Deputies Stewart and Howell had positioned themselves fifty to seventy-five yards west of Childress's Landing in a wooded area. Chief Deputy Anderson testified "we could hear what sounded, to us, like something being pitched up into the truck." Deputy Howell stated that he could see a light on the boat and "occasionally, I could see a figure or an outline of some persons moving." He could also hear "the sound of people throwing bales of marijuana into a truck."
After approximately thirty minutes of loading, The Ricky G proceeded west in the canal toward Mobile Bay. The refrigerator truck also attempted to leave, but moved only fifty to one hundred feet away from the canal before being stopped. Chief Deputy Anderson stated that when his group, which had been stationed in the woods, identified themselves as police officers, "everybody scattered". The persons in the truck fled the scene but were later arrested. The Ricky G, which had also been stopped, was escorted back to the scene at Childress's Landing and two or three persons were arrested aboard ship.
*399 After the capture of the truck and the boat, the defendant was discovered clinging to the bank of the canal, up to his shoulders in water, approximately ten or twelve feet off the bow of The Ricky G. Deputy Howell pulled the defendant out of the water: "(W)hen we first pulled him out of the water, I placed him under arrest and read him his rights." From all accounts the defendant was so cold he could not talk or stand up. He did indicate that he understood his rights by shaking his head. Deputy Nunley stated that the defendant was "near dead" when he was pulled from the water. There was testimony that the temperature at that time was between eighteen and twenty-three degrees. The defendant was immediately placed in a patrol car "to warm him up" and taken to "the fire station where the paramedics could give him some medical attention."
Deputy Stewart testified that after the defendant had been helped from the water no one else was found around the truck: "(W)e checked to see that there was nobody else around the truck. And I went to the rear of the truck, and on the ledge, all the way across the back of it, was quite a bit of loose marijuana seed and residue. The truck was locked." Deputy Stewart then stated that "(w)e got a jack handle and pried the lock off and opened it." Over two hundred bales of marihuana weighing over 7,000 pounds were found inside the truck. There were no bales of marihuana found on The Ricky G at this time.
Deputy Nunley advised the defendant of his constitutional rights at the fire station. Nunley testified that as the defendant began to "come around" he said "he wanted to talk to us about what had happened, ... if it would help him any." Deputy Howell was immediately informed of this fact by radio dispatch and arrived at the fire station between forty-five minutes and one hour after the defendant had initially been pulled from the water.
Deputy Howell testified that the defendant's condition "was much better" when he saw him at the fire station. Deputy Nunley stated that by the time Howell arrived the defendant "was pretty well out of it and beginning to warm up a little."
Prior to questioning, Deputy Howell gave the defendant his Miranda warnings and further testified that the defendant was not threatened or intimidated, offered any reward, hope of reward, or promised anything whatsoever before making his statement. When asked what he wanted to talk about the defendant stated that he "just wanted to try and get things cleared up", and that he had made "a mistake and got caught." The defendant stated that between seven to ten persons had been involved and that some of those involved were not at the scene. Deputy Howell testified that the defendant told him that some of these people had come over in a cream colored Chevrolet Blazer. The defendant also told Deputy Howell that a rented car was involved, that some of the persons involved were staying in the Holiday Inn and others in the Ramada Inn in Mobile. The defendant told Deputy Howell who owned the boat.
The defendant's statement was not reduced to writing. After the defendant had made his statement, he was taken to the hospital emergency room where "they" found that everything was normal.
Ms. Deborah Sennett of the Department of Forensic Science identified the plant material she had received from Richard Carter as marihuana. Mr. Carter had collected samples of the marihuana from the refrigerator truck and The Ricky G the night the defendant was arrested. Ms. Sennett stated that each sample she examined and analyzed was marihuana and that each sample contained the active ingredient tetrahydrocannabinol.

I
The Alabama Controlled Substances Act is constitutional. Boswell v. State, 290 Ala. 349, 276 So.2d 592 (1973); Warren v. State, 52 Ala.App. 35, 288 So.2d 817, reversed on other grounds, 292 Ala. 71, 288 So.2d 826 (1973).

*400 II.
The defendant specifically alleges that the warrantless searches of The Ricky G and the refrigerator truck were illegal in that the State failed to meet any of the exceptions to the Fourth Amendment warrant requirements. We need not decide that question because at the threshold we are convinced the defendant lacked standing to contest the validity of the search and seizure. This is so because, based on all the facts and circumstances, the defendant did not have any legitimate expectation of privacy from governmental invasion in the areas searched. United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).
Persons charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated. Salvucci, supra; Rakas, supra. The burden rests on the defendant to prove not only that a search was illegal, but also that he had a legitimate expectation of privacy in the area searched. Rawlings, supra. "(A) prosecutor may, with legal consistency and legitimacy, assert that a defendant charged with possession of a seized item did not have a privacy interest violated in the course of the search and seizure." Salvucci, 100 S.Ct. at 2551.
The automatic standing rule of Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 5 L.Ed.2d 697 (1960), was specifically overruled in Salvucci, 100 S.Ct. at 2554. See also Rawlings, supra. The test of standing is found in Salvucci.
"The person in legal possession of a good seized during an illegal search has not necessarily been subject to a Fourth Amendment deprivation. As we hold today in Rawlings v. Kentucky, post, at 2556, legal possession of a seized good is not a proxy for determining whether the owner had a Fourth Amendment interest for it does not invariably represent the protected Fourth Amendment interest."
* * * * * *
"While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, see Rakas, supra, 439 U.S., at 144, n. 12 [99 S.Ct., at 431], property rights are neither the beginning nor the end of this Court's inquiry. In Rakas, this Court held that an illegal search only violates the rights of those who have a `legitimate expectation of privacy in the invaded place.' Rakas, id, at 140 [99 S.Ct., at 430]. See also Mancusi v. DeForte, supra [392 U.S. 364, 88 S.Ct. 816, 19 L.Ed.2d 869]."
* * * * * *
"As in Rakas, we find that the Jones standard (legitimately on the premises) `creates too broad a gauge for measurement of Fourth Amendment rights' and that we must instead gauge in a `conscientious effort to apply the Fourth Amendment' by asking not merely whether the defendant had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched." Salvucci, 100 S.Ct. at 2552-3.
The Salvucci test for standing is whether the defendant had a legitimate expectation of privacy from governmental invasion in the area searched. Whether he was legitimately on the premises is a relevant but not controlling or determinative factor in deciding one's expectation of privacy. Lentini v. State, Ala.Cr.App., 406 So.2d 998 (1980). Even had the defendant claimed ownership of the marihuana found in the boat and truck, which he did not, this bare claim would not have entitled him to challenge the search without some showing of his expectation of privacy. Rawlings.
The defendant in this case tried to put as much distance between himself and the criminal activity as possible. Not only did he not claim ownership of the marihuana, he did not claim ownership of either the boat or truck. In his statement the defendant maintained that he had "come over" in *401 a Chevrolet Blazer with other persons involved in the crime. He further told Deputy Howell "who owned the boat" but admitted no more in his statement than he had "made a mistake and got caught." This falls far short of establishing a legitimate expectation of privacy from governmental invasion of the truck or the boat.
There is no showing contained in the record that the defendant was a crew member of The Ricky G.
Moreover, there is no indication whatsoever that the defendant took any precautions to maintain his privacy, either on the boat or on the truck. Rawlings. The Ricky G was first seen by law enforcement officers tied up in the slip at Moesch's Diesel. The yard foreman could not explain its presence; "he didn't know anything about the boat." For all that appeared the boat was abandoned. No one was on board and the officers had to do nothing more than lift the hatch cover to discover the marihuana. As for the truck, it and the defendant were moving in opposite directions after the marihuana had been unloaded. The defendant did not assert a property or possessory interest in the boat or the truck, an interest in the property seized or a legitimate expectation of privacy in the area of the boat searched. McCraney v. State, 381 So.2d 102 (Ala.Cr.App.1980). It cannot be seriously contended, under these facts, that the defendant had any legitimate expectation of privacy in the searched areas. United States v. Coats, 611 F.2d 37 (4th Cir. 1979); United States v. Vicknair, 610 F.2d 372 (5th Cir. 1980); United States v. Egan, 501 F.Supp. 1252 (S.D.N.Y.1980); Cuevas v. State, 151 Ga.App. 605, 260 S.E.2d 737 (1979).

III
The defendant alleges that the statement he made to Deputy Howell at the Gulf Shores fire station was involuntary and should not have been admitted into evidence. He argues that due to his physical condition he was incapable of making a knowing waiver of his constitutional rights.
The State presented sufficient evidence to demonstrate that a voluntariness predicate was properly established. The evidence elicited during the voluntariness hearing was conflicting but, we believe, supportive of the trial court's determination to admit the defendant's statement into evidence. Hegmon v. State, 50 Ala.App. 486, 280 So.2d 192 (1973).
The duty of determining voluntariness of a confession is within the sound discretion of the trial court. Crawford v. State, 377 So.2d 145 (Ala.Cr.App.), affirmed, 377 So.2d 159 (Ala.1979). Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the trial court's ruling as to voluntariness of a confession need only be supported by substantial evidence and not to a moral certainty. Taylor v. State, 361 So.2d 1189 (Ala.Cr.App.1978); McNair v. State, 50 Ala. App. 465, 280 So.2d 171, cert. denied, 291 Ala. 789, 280 So.2d 177 (1973). A voluntariness predicate laid by the State is sufficient to show prima facie that a confession was made voluntarily. Walker v. State, 269 Ala. 555, 114 So.2d 402 (1959). The trial judge is not required to accept the testimony of the defendant as to the voluntariness of a confession if there is substantial testimony by others sufficient to constitute a predicate for the admission in evidence of the confession. Bradley v. State, 337 So.2d 47 (Ala.Cr.App.1976). Thus, based on all the surrounding facts and circumstances we find no abuse in the trial court's discretion in admitting the defendant's statement.

IV
The State's evidence was sufficient to prove the defendant's guilt as charged in the indictment beyond any reasonable doubt. Contrary to the defendant's assertion, the State's evidence sufficiently proved that the substance seized was marihuana. The testimony of Ms. Deborah Sennett, alone, satisfied that requirement. Ms. Sennett stated that each sample of plant material she examined and analyzed was *402 marihuana, the variety which "is a controlled substance in the State of Alabama." Ms. Sennett further stated that the marihuana she examined contained the active ingredient tetrahydrocannabinol.
The defendant bases his contention of error on the following question and answer which occurred during Ms. Sennett's cross examination.
"Q. Can you tell whether or not that you have been shown by Mr. Hendrix, you know, the ones that you were shown by him, whether they came from a mature stock?
"Can you tell that they came from a mature stock of the plant, whatever type of cannabis plant it was? Did it come from the mature stock of that plant?
"A. Yes, it did."
The defendant submits that Ms. Sennett's response proves that the plant material she examined was not marihuana as defined by statute. We do not find the defendant's argument persuasive.
Alabama Code Section 20-2-2(15) (1975) defines marihuana as follows:
"All parts of the plant Cannabis sativa L., whether growing or not, the seeds thereof, the resin extracted from any part of the plant and every compound, manufactured, salt, derivative, mixture or preparation of the plant, its seeds or resin. Such term does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil or cake or the sterilized seed of the plant which is incapable of sterilization."
"Marijuana" is the older more general term used for "marihuana" as defined in Section 20-2-2(15). Haynes v. State, 54 Ala.App. 714, 312 So.2d 406, cert. denied, 294 Ala. 758, 312 So.2d 414 (1975). The incriminating ingredient of tetrahydrocannabinol, THC, is the chemical the possession of which is condemned by statute. McKenzie v. State, 57 Ala.App. 69, 326 So.2d 135 (1976). Haynes, supra. Ms. Sennett testified in her capacity as an expert that the marihuana introduced into evidence contained tetrahydrocannabinol. Her answer that the marihuana came from mature stock is not the equivalent of being mature stock, and is in no way contradictory to her testimony that the marihuana she examined contained tetrahydrocannabinol. This Court must take the evidence favorable to the prosecution as true, and accord to the State all legitimate inferences therefrom. Johnson v. State, 378 So.2d 1164 (Ala.Cr. App.), cert. denied, 378 So.2d 1173 (Ala. 1979).
Knowledge of the presence of the prohibited substance may be established by circumstantial evidence, and guilt does not depend upon ownership. Henderson v. State, 347 So.2d 540 (Ala.Cr.App.1977). Guilty knowledge may be proved by the acts or conduct of the accused from which it may be fairly inferred that he knew of the existence of the prohibited substance at the place where it was found. Temple v. State, 366 So.2d 740 (Ala.Cr.App.1978). Where the presence of the accused at the scene is established through both direct and circumstantial evidence, and the evidence of the accused's knowledge of the presence of the prohibited substance is shown together with other incriminating evidence, then the issue of the accused's guilt should be submitted to the jury. Henderson, supra. The defendant's motion in his case to exclude the State's evidence was properly denied.

V
Defendant's requested charges number 11,17 and 18 were not hypothesized on a "belief from the evidence" and for that reason alone were properly refused. Thompson v. State, 369 So.2d 50 (Ala.Cr. App.), cert. denied, 369 So.2d 52 (1979); Hudson v. State, 335 So.2d 208 (Ala.Cr. App.), cert. denied, 335 So.2d 211 (Ala.1976).
We have carefully considered each issue raised by the defendant. In addition, we have searched the record, as required by law, for prejudicial error affecting the defendant's substantial rights and have found *403 none. The trial court's judgment of conviction is due to be affirmed.
AFFIRMED.
All Judges concur.

ON REHEARING
BOWEN, Judge.
On rehearing, the appellant argues that the State has never challenged his standing to contest the constitutionality of the search and seizure. Aware of the case of Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), which has not been cited by the appellant, we have previously considered the argument now advanced by the appellant on rehearing. Neither the arguments in support of the various contentions of the parties at trial nor the reason the trial judge denied the motion to suppress appear in the record. However, from the questions asked the witnesses at the hearing on the motion to suppress, it appears that this issue was raised. If the ruling of the trial court is correct for any reason, it will not be reversed. Harnage v. State, 290 Ala. 142, 274 So.2d 352 (1972); Knox v. State, 365 So.2d 349 (Ala.Cr.App.1978). The application for rehearing is overruled.
OPINION EXTENDED;
APPLICATION FOR REHEARING OVERRULED.
All Judges concur.