The appellant, Paul Michael Ramires, was convicted of the offense of unlawful possession of marihuana in violation of §20-2-70, Code of Alabama 1975. He was sentenced to fifteen years' imprisonment.
The following is a rendition of the facts which were established by the testimony taken during the trial and during the hearing on the motion to suppress.[1] On the evening of February 9, 1980, Investigator Pierce of the Baldwin County Sheriff's Department was patrolling in the vicinity of County Road 4 when he noticed an "18-wheeler" truck stop by Moesch's Diesel Repair and Shipyard. Upon observing a vehicle following the truck, Pierce ascertained that the automobile was a Hertz rental car from Mobile. When Pierce later drove by, the truck was not there, but he observed a chain across a driveway located west of Moesch's Diesel. The driveway, which belonged to Childress and Company, provided access to the Intracoastal Canal. In going by that driveway almost every day, Pierce had never before seen a chain across it.
He left the area and attempted to locate the truck, but after a futile search, Pierce returned. When he passed the driveway this time, he observed truck tracks coming from the driveway onto the pavement. The chain was not there. Pierce drove down to the canal, where he observed small pieces of burlap and evidence of a lot of foot traffic. Again, he left and futilely attempted to find the truck. He returned between 4:00 and 5:00 a.m. The chain was again blocking passage down the driveway.
Later in the morning of February 10, Pierce met Chief Deputy Anderson and, after removing the chain, they went down to the canal, where they saw a V-shape indentation in the bank. Upon glancing toward Moesch's Diesel, Pierce noticed the rigging of a shrimp boat which had not been there the night before. From a vantage point approximately 125 yards from the boat, the two officers observed mud on the boat's bow and the boat's name which, at the time, they thought to be Ricky C. They later discovered that the boat was the Ricky G.
The shipyard foreman, Mr. Redding, was summoned to Moesch's Diesel by the officers. After observing that the boat was tied in a slip without his prior approval or knowledge, Redding yelled to see if anyone was on board. When he received no response, he went aboard and made a general search. After asking Redding if it was all right to come aboard, the two officers boarded the boat. Redding then decided to look in the fishhold. He made this decision, not by suggestion or direction of either of the two officers, but because three years earlier, two men had died in the fishhold of a boat and, because he had discovered no one on deck, he thought someone might be below. So Redding pushed over an outboard motor which was lying on the hatch. The testimony conflicts on the point of whether Pierce aided Redding in lifting the hatch. When the hatch was lifted, Redding and the officers observed burlap wrapped bales. From the bales' appearance and odor, the Chief Deputy suspected them to be marihuana. The men closed the hatch, replaced the motor, and left. The boat was then put under surveillance. Then, Anderson and Pierce surveyed the surrounding area in an attempt to find the rental automobile seen earlier.
After a futile search, Anderson and Pierce went back down to the canal, where they observed activity around the shrimp boat. Later, the truck arrived at the canal *Page 618 
bank and the Ricky G subsequently pulled up beside it. Although Anderson could not distinguish anyone, he could hear "what sounded to be something being thrown up into the rear of the truck," which based upon his experience, sounded like bales of marihuana being thrown into the truck. After the truck had cranked up and was starting to move, and while the boat was backing out into the canal, Anderson directed all surveillance units to move in. A boat carrying several Gulf Shores police officers followed the Ricky G. When the Ricky G was stopped, Officers Yohn, Maples, and Stewart boarded the boat; placed its occupants, Calvin Collier and Ramires, under arrest; and informed them of their Miranda rights. Both were asked if either could pilot the shrimp boat back to shore, but they said that neither knew how to operate it and that neither was piloting the boat when it was stopped.
After the boat was taken back to Moesch's Diesel area, Mr. Carter of the Department of Forensic Science boarded the boat and collected green plant material from the hold and the deck. He also collected a bale and samples from 28 of the bales in the truck. This plant material, upon testing, was determined to be marihuana.
Ramires was indicted for unlawful possession of marihuana as proscribed by § 20-2-70, Code of Alabama 1975. Throughout the proceedings below, Ramires contested the admissibility of the marihuana which formed the basis of the indictment. He specifically contended that the marihuana was the product of an illegal search of the Ricky G.
At the suppression hearing, Ramires testified that Robert Collier and Roy Nicaud were the owners of the shrimper; that he had been employed by the two men for approximately one and one-half years; that he regularly worked on the Ricky G as a crewman; that his duties included "a little bit of everything," except he did not load and unload the boat's cargo; and that, when the boat was seized, he was on the boat, but Calvin Collier was piloting the boat. Ramires further explained that when he worked on the boat, he stayed in quarters in the wheelhouse and he left some personal belongings aboard, but he did not store any personal items such as clothes or toiletries down in the hold. Ramires also testified that, although he did not know at all times what the boat was carrying, he knew what its cargo was on February 10. Finally, Ramires claimed to have a possessory interest in the marihuana.
In addition to Ramires's testimony, the trial court heard the testimony of the shipyard foreman, Redding, who testified that, when he observed the boat, it was blocking a slip owned by Moesch's Diesel and was on private property; that boats are never left there; that a gangplank connected the vessel with the dock; and that no one was aboard.
Finally, Officers Stewart and Yohn testified that, when they seized the boat, they asked Ramires and Collier who was piloting the boat, because someone had to pilot the shrimper back to the dock. Both answered that neither was piloting the boat, neither knew how to operate the boat, and neither owned the boat.
Ramires contends that, contrary to the trial court's ruling, the marihuana seized as a result of the warrantless entry and search of the Ricky G should have been suppressed. However, it is now settled that a defendant may not claim the benefits of the exclusionary rule unless his or her own Fourth Amendment rights have been violated.[2] Cochran v. State, [Ms.6 *Page 619 
Div. 886, April 24, 1984] (Ala.Cr.App. 1984). Thus, our threshold consideration is "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128,143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) (citing Katz v.United States, 389 U.S. 347, 353, 88 S.Ct. 507, 512,19 L.Ed.2d 576 (1967)). See also Collier v. State, 413 So.2d 396
(Ala.Cr.App. 1981), aff'd, 413 So.2d 403 (Ala. 1982). It is not sufficient that a defendant may have a subjective expectation of privacy, for "[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."Rakas, 439 U.S. at 144, n. 12, 99 S.Ct. at 430, n. 12. In making this determination, we are guided by the requirement that "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas, 439 U.S. at 131, n. 1, 99 S.Ct. at 424, n. 1. See also Rawlings v. Kentucky,448 U.S. 98, 104-05, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). Although courts do not often discuss the applicable standard of proof, when they do, it is declared to be the preponderance standard. 3 W. LaFave, Search and Seizure, § 11.2 (c) (Supp. 1985).
Ramires contends on appeal, as he did in the trial court, that he sufficiently met the burden and standard of proof by the following evidence: (1) he was legitimately on board the shrimper as a crewman, and (2) he claimed to have a proprietary interest in the marihuana.
Legitimate presence on the premises at the time of the search was once considered a basis for asserting Fourth Amendment rights. Jones v. United States, 362 U.S. 257, 265-67,80 S.Ct. 725, 733-34, 4 L.Ed.2d 697 (1960). However, in Rakas,439 U.S. at 148, 99 S.Ct. at 433, the Court proclaimed that, while relevant, the fact that a defendant was legitimately on the premises is not determinative of whether he or she had a legitimate expectation of privacy in the particular area searched. See also Lentini v. State, 406 So.2d 998, 1001
(Ala.Cr.App. 1980), cert. denied, 406 So.2d 1003 (Ala. 1981). However, in the instant case, Ramires was not even on board the vessel at the time of the initial entry and search.
Thus, the only remaining evidence upon which Ramires asserts that his own Fourth Amendment rights were violated in his assertion that he, in fact, had some type of proprietary interest in the seized marihuana. However, upon our review of the manner in which this testimony was elicited, we find that the trial court was reasonable in its skepticism about Ramires's claim. Ramires's claim of proprietary interest was elicited as follows:
 "THE COURT: You didn't have any of your property in the hold; is that right?
 "THE WITNESS: Well, whatever goes in the hold, you know, that's just —
 "THE COURT: Was that a part of your property, I mean, whatever went into that hold, was that your property?
 "MR. BOLTON [defense counsel]: What the Judge is asking you, Paul, did you have any interest of what was in the hold of the boat at this time and you answered that you did and you need to answer to the Judge why.
"THE COURT: You had an interest in that property?
"THE WITNESS: Yes." (Emphasis added.)
Prior to the attorney's supplied "answer," Ramires had not admitted that he had any interest in the marihuana. The attorney's prompting continued as follows:
 "Q. Did you have an interest in what [the boat] was carrying? *Page 620 
"MR. BOLTON: Answer him yes, yes, say yes.
"THE WITNESS: Yes, I did.
". . .
 "Q. Now, Mr. Ramires, what was your interest in the load . . .?
 "MR. BOLTON: And Your Honor, at this time, we want to inject the Fifth Amendment privilege.
"THE COURT: Overrule the objection.
"THE WITNESS: Making money." (Emphasis added.)
It is clear that the only evidence before the trial court concerning any interest Ramires might have had in the marihuana was weak, at best, and unpersuasive. Ramires was reluctant to admit an interest in the marijuana and only did so after questionable suggestions, instructions, and urgings from his trial counsel. Therefore, we find no abuse of discretion by the trial court in its limited consideration of this testimony.
Even if the trial court had credited this testimony, a bare claim of ownership is insufficient to establish the defendant's right to claim a Fourth Amendment violation. Although possession once gave "automatic standing" to a defendant charged with a possessory crime, Jones, 362 U.S. at 261-65,80 S.Ct. at 731-33, in United States v. Salvucci, 448 U.S. 83,91-92, 100 S.Ct. 2547, 2552-53, 65 L.Ed.2d 619 (1980), the Supreme Court, in overruling this principle, stated:
 "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, see Rakas, supra, at 144, n. 12 [99 S.Ct. at 430, n. 12], property rights are neither the beginning nor the end of this Court's inquiry. . . .
 "We simply decline to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched."
The Salvucci Court concluded that only a legitimate expectation of privacy in the premises searched is sufficient to confer standing. 448 U.S. at 93, 100 S.Ct. at 2553.
Salvucci's ruling that possession of the property seized is alone not enough to establish standing was fortified by the Court's holding in Rawlings. In Rawlings, the defendant claimed ownership of drugs that were seized during a search of a companion's purse. As Rawlings made clear, ownership is merely one factor to be considered; it does not alone establish a privacy interest in the area searched. 448 U.S. at 105,100 S.Ct. at 2561. As further indicated by the Rawlings Court, ownership of the object carries little or no weight if the defendant put it in a place from which he could not reasonably expect to exclude others or put the object in plain view.448 U.S. at 105-06, 100 S.Ct. at 2561-62. This court, adopting the ruling of Rawlings, has stated that the bare claim of ownership of the seized property does not entitle one to challenge the search without some showing of an expectation of privacy.Collier, 413 So.2d at 400. See also Lentini, 406 So.2d at 1001.
Thus, even assuming arguendo that Ramires established by credible evidence that he was legitimately aboard the shrimper during its search and that he in fact possessed the marihuana, these factors do not establish that Ramires had a constitutionally justifiable expectation of privacy in the hold. This determination of the legitimacy of Ramires's claim of privacy requires an examination of all the surrounding circumstances. Rakas, 439 U.S. at 152, 99 S.Ct. at 435 (Powell, J., concurring.) See also Collier, 413 So.2d at 400.
One such circumstance to be considered is that "the `reasonable' expectation of privacy is often less aboard a vessel than on land." United States v. Ortega, 644 F.2d 512,514 (5th Cir. 1981). See also United States v. Egan,501 F. Supp. 1252, 1269 (S.D.N.Y. 1980). Moreover, "[t]he degree of privacy one may reasonably expect varies according to the vessel one is aboard." United States v. Gollwitzer,697 F.2d 1357, 1360 (11th Cir. 1983). In Alabama, a shrimper such as theRicky G is subject to administrative searches; the Department *Page 621 
of Conservation and Natural Resources or its authorized agents have statutory authority to board any watercraft which is engaged in taking or catching shrimp. Code of Alabama (1975) §9-12-31. Section 9-12-116 specifically prohibits any boatman from refusing to open his boat where seafoods may be dumpted, kept or stored, except his actual residence, for inspection by any officer whose duty it is to inspect such. Consequently, a crew member's reasonable expectation of privacy from governmental intrusion is less in the fishhold of a shrimping vessel which is subject to these inspections, for the crewman does not have any right to exclude other persons from access to the hold. See Rawlings, 448 U.S. at 105, 100 S.Ct. at 2561;Rakas, 439 U.S. at 144, n. 12, 99 S.Ct. at 430, n. 12. Not only did Ramires fail to establish that he had such dominion and control over the hold as to exclude inspectors, but he also failed to show that the hold was not accessible to all employees.
The crew member's right to privacy also depends on the particular area of the vessel which is searched. Gollwitzer, 697 F.2d at 1360. A crewman would clearly have a reasonable and legitimate expectation of privacy in his or her private quarters, foot locker, or duffel bag.
 "It is well established that a ship generally has a lesser expectation of privacy than a house or office. A crewman on a vessel may well have an expectation of privacy in his living quarters, but his mere presence upon the vessel does not create a constitutional right to protection from searches by law enforcement officers anywhere else on the vessel. A crewman may fairly be likened to the conductor of a train on an overnight journey who may well have an expectation of privacy in the sleeping car to which he has been assigned quarters, but who could hardly allege privacy rights in the baggage car."
United States v. Streifel, 507 F. Supp. 480, 487 (S.D.N.Y.), aff'd, 665 F.2d 414 (2d Cir. 1981). The evidence in the instant case established that Ramires's occasional living quarters were not located in the hold and that Ramires stored no personal belongings in the hold.
Ramires established neither a property nor a possessory interest in the boat. In fact, on the night the boat was seized, Ramires claimed that he was not piloting the boat, he did not know how to pilot the boat, and he did not own the boat. Ramires further failed to present evidence that, at the time of the search, he had taken precautions to guarantee his alleged privacy interest in the hold. See Rawlings,448 U.S. at 105, 100 S.Ct. at 2561; Collier, 413 So.2d at 401. To the contrary, at the time of the search, the vessel appeared abandoned; it was docked on private property without permission or knowledge of the property owner; the gangplank offered unobstructed access aboard; and the hatch to the hold was not locked or bolted down. Moreover, as noted above, at the time of the search, no one was aboard to be in a position to exclude others. In addition, Ramires revealed no prior personal use or access to the hold. Rawlings, 448 U.S. at 105,100 S.Ct. at 2561.
From our examination of the totality of the circumstances, we conclude that Ramires failed to establish the requisite interest in the fishhold of the Ricky G to warrant a finding that he had a legitimate and reasonable expectation of privacy; thus, Ramires failed to establish that the warrantless entry and search of the fishhold violated his own Fourth Amendment rights. In sum, we find no reason to reverse the trial court's ruling on Ramires's motion to suppress. Hence, we pretermit inquiry into whether the instant search was legal.
Accordingly, the judgment of the circuit court is affirmed.
AFFIRMED.
All the Judges concur.
[1] See also Nicaud v. State, ex rel. Hendrix, 401 So.2d 43 (Ala. 1981), and Collier v. State, 413 So.2d 396 (Ala.Cr.App. 1981), aff'd, 413 So.2d 403 (Ala. 1982), which arose from the same scenario of events. In Nicaud, wherein the owners of the RickyG appealed adverse judgments of the trial court ordering the condemnation and forfeiture of the Ricky G, the Supreme Court held, that under the facts before it, the search and seizure of the Ricky G were illegal. In Collier, the appeal of the judgment of conviction against one of Ramires's companions, this court determined that Collier did not possess the requisite standing to contest the search and seizure of theRicky G. This ruling was affirmed by the Supreme Court.
[2] The parties state the issue as whether Ramires; had "standing" to assert his Fourth Amendment claim. However, as noted in Rawlings v. Kentucky, 448 U.S. 98, 104,100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980):
 "[I]n Rakas v. Illinois [439 U.S. 128, 138-40, 99 S.Ct. 421, 427-28, 58 L.Ed.2d 387 (1978)], . . . we abandoned a separate inquiry into a defendant's `standing' to contest an allegedly illegal search in favor of an inquiry that focused directly on the substance of the defendant's claim that he or she possessed a `legitimate expectation of privacy' in the area searched." See also United States v. Salvucci, 448 U.S. 83, 87, n. 4, 100 S.Ct. 2547, 2551 n. 4, 65 L.Ed.2d 619
(1980). *Page 622