Douglas Dale Womack was convicted of rape in the first degree, sodomy in the first degree, and robbery in the first degree. He was sentenced to life imprisonment on *Page 300 
each conviction, the rape and sodomy sentences to be served consecutively, and the robbery sentence to be served concurrently with the sodomy sentence. He raises two issues on appeal.
 I
On April 13, 1988, a black male entered the Union 76 Station at Court Street and Southern Boulevard in Montgomery, demanded money from the cashier, and then forced the cashier to the back of the store where he raped and sodomized her. During the attack, a customer, one John "Skete" Osborne, came into the store, heard the cashier crying for help, and saw the defendant on top of the cashier. Osborne asked the defendant, whom he recognized "from the neighborhood," what was going on, and, in replying, the defendant called Osborne "Skete." The following day Osborne called the police and reported what he had seen, telling them the assailant's name was "Doug," that his mother lived at 169 Pocahontas, and that his aunt lived at 201 Southern Boulevard. The police checked with the aunt, obtained "Doug's" last name and verified the fact that the defendant was residing with his sister. The following day, the appellant was arrested at his sister's house.
Based on the foregoing facts, the police had probable cause to arrest the defendant. "[I]f the citizen or victim informant is an eyewitness this will be enough to support probable cause even without specific corroboration of reliability." 1 W. LaFave, Search and Seizure § 3.4(a) at 718 (2d ed. 1987). "[A]s a general proposition any person purporting to be a crime victim or witness may be presumed reliable, though the police must remain alert to the existence of any circumstances which would make that presumption inoperative in a particular case."Id. at 719. See McCants v. State, 459 So.2d 992, 994
(Ala.Cr.App. 1984); McDaniel v. State, 446 So.2d 670, 672
(Ala.Cr.App. 1983); Hadley v. State, 391 So.2d 158, 161-62
(Ala.Cr.App.), cert. denied, Ex parte Hadley, 391 So.2d 162
(Ala. 1980).
The record shows that the defendant was arrested pursuant to a warrant, but it contains neither the arrest warrant nor the affidavit relied on by the magistrate in issuing the warrant. At trial, defense counsel did not argue that the arrest was invalid due to a lack of proof presented to the issuing magistrate, only that there was a lack of probable cause for the arrest. "Because the warrant and affidavit are not part of the record, there is nothing for this court to review concerning the validity of the arrest warrant." Sandifer v.State, 535 So.2d 203 (Ala.Cr.App. 1988) (on return to remand);Eaton v. State, 423 So.2d 352, 354 (Ala.Cr.App. 1982).
 II
Prior to trial, the court granted the defense motion for funds to have DNA testing done. Pursuant to the court's order, a sample of the defendant's blood was withdrawn and sent to Lifecodes, Inc., in New York, along with blood samples and vaginal swabs taken from the victim, for DNA analysis. A subsequent report received by forensic serologist W.H. Landrum from Lifecodes revealed that the DNA in the samples and swabs taken from the victim at the time of the crime had "degraded" and there was "insufficient DNA for comparison." Defense counsel called the Honorable Steve Simpson, defendant's attorney at the time the DNA test was requested and approved, to testify to what he (Simpson) told the defendant about the test.
The court allowed Simpson to testify that he had discussed the DNA test with the defendant and that, based on what he had read about the test, he had advised his client to take test. Simpson stated that the defendant "request[ed] the test be done. In fact, we had to file a written motion to get the funds so that the test could be done."
The court disallowed any further testimony regarding what Simpson told his client concerning the nature or reliability of the DNA test, on the ground that Simpson had not been qualified as an expert on DNA testing. The defense made an offer to *Page 301 
prove that Simpson told the defendant the test was "very accurate" and that it "would hang him or acquit him." Counsel argued that Simpson need not be a DNA expert in order to relate this statement because the statement was not offered to prove its truthfulness, but to show its effect on the hearer and to explain the hearer's state of mind in acting on the statement.
Although we question the probative value of the defendant's willingness to take the DNA test, in light of the fact that two eyewitnesses to the crime had positively identified him and he had little or nothing to lose by submitting to DNA testing, and after the test results were inconclusive, he had everything to gain by informing the jury of his willingness to submit to the test, compare Annot., "Propriety . . . of comment or evidence as to accused's willingness to take lie detector test," 95 A.L.R.2d 819, 821, 824 (1964), we need not, and do not, decide this issue. The admissibility of DNA testing and all of its evidentiary ramifications have not been decided in Alabama or, for that matter, in very many other jurisdictions. Seegenerally Burk, "DNA Fingerprinting: Possibilities and Pitfallsof a New Technique," 28 Jurimetrics J. 455 (1988); Thompson and Ford, "DNA Typing: Acceptance and Weight of the New GeneticIdentity Tests," 75 Va.L.Rev. 45 (1989); Williams, "DNAFingerprinting: A Revolutionary Technique in Forensic Scienceand Its Probable Effects on Criminal Evidence Law," 37 Drake L.Rev. 1 (1987).
If the trial court's ruling is correct for any reason, it will not be reversed on appeal. Duncan v. State, 436 So.2d 883,903 (Ala.Cr.App. 1983), cert. denied, 464 U.S. 1047,104 S.Ct. 720, 79 L.Ed.2d 182 (1984); Collier v. State, 413 So.2d 396,403 (Ala.Cr.App. 1981), affirmed, 413 So.2d 403 (Ala. 1982). Even if the excluded testimony was error, it was harmless, because substantially the same evidence was elicited from other witnesses. The following occurred during defense counsel's questioning of forensic serologist W.H. Landrum:
 "Q And if, in fact, this evidence that was sent off to Lifecodes had not been in a degraded condition, it would be able to tell with 99 percent accuracy whether or not Mr. Womack was the perpetrator? Isn't that fair to say?
"A That's according to Lifecodes; yes, sir.
"Q Do you have any dispute with that?
 "A It depends again — if you assume that there was a sufficient sample, the sample was not degraded, then it would have been 99.9 percent certainty.
 "Q But there [was] no way for the defendant to know whether it was degraded or if there was not enough for a sample, was there?
"A No, sir."
Then during redirect examination of the defendant, defense counsel elicited the following:
 "Q What did Steve Simpson tell you about that D.N.A. test?
 "A Well, Steve told me that if I go on with the D.N.A. test, —
 "MR. BELSER: I object on the same grounds as we took up out of the presence of the jury.
"THE COURT: I will let him answer.
"(By Mr. Law:)
"Q Go ahead.
 "A Steve told [me], he said, his exact words were, Doug, if you go on with the test, it can prove that you did or didn't do it. I said, Steve, I'd rather go on with the test."
Because the jury heard evidence to the same effect as Simpson's excluded testimony, that excluded testimony would have been cumulative, and its exclusion was therefore harmless.Williams v. State, 531 So.2d 49, 52 (Ala.Cr.App. 1988).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur. *Page 302